**Barbara CHERRY, Plaintiff–Appellant,**

v.

**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY and Robert Brown, Defendants–Appellees.**

**No. 94–1535.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1994.

Decided Feb. 8, 1995.

---

Vicki Lafer Abrahamson (argued), Carrie J. Lausen, Abrahamson & Associates, Chicago, IL, Jacqueline H. Lower, Woodstock, IL, for plaintiff-appellant.

Charles C. Jackson (argued), Camille A. Olson, David J. Rowland, Ana M. Flynn, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for American Tel. & Tel. Co.

Charles C. Jackson (argued), David J. Rowland, Ana M. Flynn, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Robert Brown.

Before POSNER, Chief Judge, COFFIN * and BAUER, Circuit Judges.

COFFIN, Circuit Judge.

This is a sex discrimination in employment case, brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5, *et seq.* Plaintiff, a regional attorney in the Chicago office of American Telephone & Telegraph Co. (AT & T) during the period of the events at issue, sued AT & T and her supervisor, Robert Brown, Government Affairs Vice President for the Central Region, on August 7, 1992, alleging that they had failed to promote her although similarly situated males had been promoted. Then followed one and two-thirds years, some fourteen depositions throughout the country, and the assembly of 6,000 pages of depositions, affidavits, answers to interrogatories, and other documents. Ultimately, on March 28,

---

* The Honorable Frank M. Coffin of the First Circuit is sitting by designation.

1994, the district court granted summary judgment in favor of defendants.

Plaintiff's claim is that, despite many outstanding evaluations of her performance, three male lobbyists in her region were singled out under a "flexible salary plan" (the flex plan) for promotion to a higher salary grade without being required to change their location while she was not. Instead, her only offer of promotion to the higher grade was conditioned upon her relocation to the nation's capital. She argues that the same flex plan should have been invoked in her behalf or, alternatively, that a "management job evaluation" of her position could have been used to promote her. AT & T counters that plaintiff has not been discriminated against and that her effectiveness has continually been recognized. It asserts that the flex plan, which has never been applied to any regional attorney, was targeted only at its lobbyists, who lacked the opportunities for advancement via geographical moves available to more generally adaptable professionals such as lawyers. It also contends that no inference of discrimination can arise from its failure to invoke the management job evaluation process on plaintiff's behalf.

The district court ruled that plaintiff had not established a prima facie case in that the evidence failed to show that she was a lobbyist or that either promotion vehicle—flex plan or management job evaluation procedure—was withheld from her through sex discrimination. We affirm.

### I. Background

#### A. Plaintiff's Employment at AT & T

Plaintiff's ten years of employment by AT & T encompassed the following:

1983—After obtaining both a law degree and a masters' degree in economics from Harvard and working for several years as an associate in a Chicago law firm, plaintiff was hired as an attorney in the Legal Department.

1985—In January, at her request, she was transferred to the Public Affairs Department, where she worked as a lobbyist.

—In August, plaintiff expressed a preference to fill an opening for a regional attorney in charge of governmental relations in a number of states, and was made regional attorney for the Central Region, in Public Affairs. Defendant Brown had just been put in charge of that region, over both plaintiff and all the region's lobbyists, who were also state directors.

1989—In July, AT & T merged three government relations departments—Public Affairs, External Affairs, and Regulatory Affairs—into two. One, dealing with state regulatory, legislative, and executive bodies, was the State Government Affairs office (SGA) in which plaintiff remained the regional attorney for the Central Region, working with several lobbyists, and reporting directly to defendant Brown. The other, dealing with federal regulatory and executive bodies, and Congress, was the Federal Government Affairs office (FGA).

1990—From January to mid-August, AT & T and plaintiff explored the possibility of a transfer to FGA in Washington at a higher salary grade. AT & T formally offered plaintiff the position in August. Talks fell through because of various financial problems plaintiff faced and AT & T's refusal to find plaintiff's husband a job or to fund commuting expenses.

1991—In September, plaintiff began pursuing a Ph.D. at Northwestern. She was given the necessary time off work, payment by AT & T of her $15,000 annual tuition, access to a company car, and a promise of the job of Director of Operations Analysis when it became available. On October 28, AT & T announced plaintiff's assignment to that post as of December 1.

1993—In September plaintiff voluntarily left AT & T.

#### B. Plaintiff's Record

Plaintiff's performance was consistently recognized as outstanding. Her name was on the Leadership Continuity Program list from 1988 through 1992. She was also on the "promotability list." In 1990 she was identified as an "executive potential candidate" and, in 1991, as a "comer." She was

identified as a future leader in "succession planning lists" from 1989 through 1992. Through defendant Brown's favorable evaluations, her compensation increased every year, from $54,000 in 1985 to $100,045 in 1991.

### C. *The Lobbyists' Promotions*

On November 1, 1991, three days after the announcement of plaintiff's lateral transfer (without a raise) to become Director of Operations Analysis, two lobbyists in the Central Region, Blackwell and Anderson, were promoted from salary grade 10 (SG 10), plaintiff's grade, to SG 11. Blackwell was given an SG 11 for his vital services in Illinois, his federal procurement accomplishments for AT & T, his achievements in improving marketing in all of Cook County, and his liaison with the Congressional Black Caucus. Anderson was promoted on the basis of being the lone AT & T operator in Michigan, what AT & T called "the most politically contentious state," and for legislative successes in retiree health care.

Earlier, in June, 1991, another Central Region lobbyist, Doty, had been given a promotion to SG 11 through SGA's flex plan because of work deemed very important with the Illinois and Wisconsin federal delegations and in connection with critical telecommunications legislation. And over two years earlier a regional attorney in the Western Region, Kindrick, who had been assigned dominant lobbying duties in Hawaii and the direct supervision of lobbyists in Sacramento and San Francisco, was, through a management job evaluation,[1] designated regional attorney *and* state director, and elevated to SG 11.

Plaintiff became convinced that defendants were discriminating against her, filed charges with the Equal Employment Opportunity Commission, and brought this action.

### II. *Analysis*

### A. *Standards*

■ There are three basic sets of standards that apply to this case. This being an employment discrimination case, we are guided by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and its four prong test of a prima facie case: (1) application by plaintiff to fill a vacancy; (2) qualification; (3) rejection; (4) continued efforts of employer to seek applicants with plaintiff's qualifications. This guidance leaves room for adaption to different situations, for the model is not "inflexible." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207 (1981). To raise an inference of discrimination, the fundamental requirement is that a Title VII plaintiff "must show that as a female she was treated differently than a similarly situated male." *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1003–04 (7th Cir.1994).

■ The second guide is the requirement that "the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. Third, since summary judgment was granted to defendants, we must be satisfied that there exists no genuine issue as to material fact. Fed.R.Civ.P. 56. As the Court articulated this standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986): "The mere existence of a scintilla ... will be insufficient.... The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." In pursuing our inquiry, we must, of course, view the record and all reasonable inferences favorably to plaintiff. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

### B. *Plaintiff's Principal Argument*

Plaintiff claims that male employees "similarly situated" to her were promoted to an SG 11, while she, equally or better qualified, was not. She characterizes the state directors/lobbyists reporting to her own supervisor as appropriate "comparative employees." Since, she argues, the flex plan of her

---

**1.** Some witnesses testified that they thought Kindrick's promotion was effectuated through the flexible salary plan, but payroll authorization records list this as a management job evaluation decision.

SGA department applied to regional attorneys as well as to state directors, and since she had been "identified for promotion by senior management" more often than the male state directors had been, failure to invoke the flex plan to promote her constituted discrimination on the basis of sex.

■ Plaintiff's faces a formidable hurdle in arguing that she was similarly situated to the state directors/lobbyists. In a *McDonnell* situation, where one's application for an existing vacancy is rejected, the basis for comparability is simply that the applicant met the job qualifications. When the universe for comparability broadens to employment decisions such as promotions or discharges, not restricted to particular vacancies, there must, it seems to us, be an objectively identifiable basis for comparability.

One example might be an automatic system for promotion dependent upon time in service and the acquisition of credits based on additional education or training; a plaintiff denied promotion would meet the *McDonnell* standard by showing that others of the opposite sex or race who possess no greater credentials were promoted, even though the jobs involved might be different ones. Another example would be where the basis for comparability lies in a policy addressed to or aimed against the members of a protected class, regardless of the job being done. Such was the situation in *McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir.1993), cited to us by plaintiff. In that case a white medical examiner, terminated by the Chicago Transit Authority, was the only *per diem* medical examiner. He contended that the Authority was following a practice or custom of terminating all whites hired on a *per diem* basis, introducing evidence of sharply disproportionate terminations of white *per diem* attorneys. The parties themselves put the issue to the jury in special interrogatories whether the Authority "had a custom or policy of terminating white *per diems*." *Id.* at 509. The court, in holding that *McNabola* was similarly situated to the *per diem* attorneys, observed that the basis of comparison was not "the precise task" of attorneys and physicians but their common status as independent contractors used for their expertise. *Id.* at 514.

In this case, however, the flex plan lacks the element of a company-wide policy targeting all members of a protected group like that in *McNabola*. That is, there is no contention that it has been withheld from regional attorneys because all of them are women. Instead, we confront what plaintiff alleges is a department-wide plan covering both regional attorneys and lobbyists, which is highly discretionary, aiming to single out those most deserving of promotion. Plaintiff's claim is that, but for her sex, defendants would have concluded, taking all of the facets of her work into account and weighing them against the demands placed on state lobbyists, that she was equally deserving of promotion.

Defendants assert that this would be tantamount to adopting a comparative worth analysis, an approach we have always rejected. *E.g., Davidson v. Bd. of Governors of State Colleges and Univs. for Western Illinois Univ.*, 920 F.2d 441, 446 (7th Cir.1990). We do not reach this question, except to say that when, as here, a plaintiff is alleging the discriminatory application of a highly discretionary program—and as evidence compares herself to employees who perform quite different functions—she faces an uphill road. Because we do not reject plaintiff's theory outright, we must inquire whether she had adduced sufficient evidence to permit a rational jury to find that regional attorneys were eligible for the SGA flex plan, and to raise an inference that the true reason defendants failed to promote her under this plan was her gender.

## C. *Application of the Flex Plan*

We start with two pillars that do not rest on the credibility of witnesses. The first is the fact that there is no evidence that any regional attorney at any period ever received a promotion through such a plan. The second is a document, dated March 14, 1991, of some nineteen pages constituting the "SGA Flexible Salary Plan," which plaintiff characterizes as "the actual Government Affairs flexible salary plan." Senior Vice President

Partoll, head of SGA, verified that this document comprised the department's plan.

We sketch some of the highlights: *Criteria* prominently included "Networking Capability," "Scope of Assignment—Elements of Federal, State, and Local responsibilities both Regulatory and Legislative," and "Complexity of Environment—responsible for Federal/State members, complexity of State Commission/State House, number of bills introduced"; *Objectives* featured "To compensate individuals who commit to long-term assignments—foregoing career enhancing or advancement alternatives—for the benefit of the corporation"; *Scope of Assignment* listed thirteen items, beginning with "state regulatory only, state legislative only, state regulatory and state legislative, state and federal legislative"; *A Proposed Clarification of SG 11 Assignments* contained seven paragraphs, all directed to differentiating among the responsibilities of various kinds of state managers.

The last pages were devoted to listing the fifty states, the lobbyists assigned to each, and data referring to numbers of members of the congressional delegation, the length of sessions of the state legislature, etc. In short, this document is redolent of the life and work of lobbyists.

Plaintiff endeavors to extract support for her assertion that she was eligible for a salary increase under this plan, despite the fact that she was not a lobbyist. In her affidavit, she deftly matches criteria announced under the various headings to her own experience as a regional attorney. For example, under "Individual Related Variables," she claims to have met the criteria of longevity, unique experience, skills in communications, negotiation, etc. Under "Job Related Variables," she claims to have dealt with a large market (ten states), to have had a wide "scope of assignment," handling legislative bills and sessions, and working without supervision. Finally, addressing the third heading of the value to the business of "promoting in place," she asserts that her knowledge of and contacts in the ten states she covered warranted such promotion.

Unfortunately, plaintiff passes over three of the documents in the SGA Plan which specifically relate only to state managers. We have already quoted from the statement of "Objectives." Even more specific is the page entitled, "A Proposed Clarification of SG 11 Assignments." Here is set out intricate considerations governing promotion to SG 11. For example, a state manager of an "A" state "with responsibility for regulatory and state and/or federal legislative matters" could be eligible. If such a manager has no regulatory responsibility, he may be eligible for an "11" if he has responsibility "for one or more committee or subcommittee chairs in the House or Senate who have major impact on AT & T." The remainder of the page, similarly precise, discusses other possibilities and indicates where a state manager of a "C" or "B" state may not exceed a "10" or even a "9." But all of the discussion relates to lobbyists. The third component passed over by plaintiff is the list of the fifty states, indicating the state managers responsible for each and some of the data relevant to their responsibilities.

In addition to her effort to bring herself within the bounds of the written flex plan, plaintiff has pointed us to various pieces of evidence in the record to support her claim that before SGA was organized, Public Affairs had a flex plan that was applicable to regional attorneys and that this plan was essentially carried over into SGA. She also claims that, in any event, her own "contact" duties (i.e., lobbyist's functions) were substantial and that therefore she should be treated as a lobbyist.

1. *Evidence that Regional Attorneys Were Eligible*

We have sifted through the record to identify and assess all of the evidence plaintiff marshals in her effort to establish that there was a flex plan in SGA that applied to regional attorneys as well as to lobbyists.

Plaintiff first points to a June 9, 1988 memorandum from the Senior Vice President of Public Affairs (one of the antecedent organizations later merged into SGA), Gerald Lowrie, stating that Public Affairs career paths were being established ranging from SG 8 to SG 11 and that regional attorneys

were included along with regional and state directors and others. Lowrie, in his deposition, acknowledged that in the old Public Affairs department, one who had not been a lobbyist had the opportunity to progress to SG 11. Under the former policy, grade 11 position was reserved for a "small segment" who were assigned not only analytical duties but "government advocate responsibilities, national political organization, lead for other IPP's (Issue and Policy Professionals)," etc. He explained that this was intended to address the needs of "advocates who are terribly important to the corporation—wanted some assurance that they could stay advocates and still get some opportunity to move." Of course, he is referring to the application of the flex plan *before* the reorganization of departments into SGA and FGA.

Three bits of evidence adduced by plaintiff refer to comments that the Public Affairs flex plan was carried over into SGA when it took over from External Affairs and Public Affairs. The first such is a December 1990 memorandum of Lowrie, briefly referring to the External Affairs and the Public Affairs Plans, pointing out that the former included only contact personnel, while the latter included all. But the memorandum goes on to say that the purpose of a meeting in the near future is to review these plans in connection with the impending reorganization.

The second is deposition testimony by Central Region Vice President William Clossey that, "as far as [he] knew," the major change in the operation of the flex plan that occurred after the internal reorganization was that certain headquarter jobs were made eligible. Plaintiff argues that his failure specifically to remember that regional attorneys were made ineligible is evidence that they were eligible. In context, however, it was made clear repeatedly that, after the reorganization, the flex plan applied only to lobbyists. Adding headquarter jobs with contact positions was consistent with the plan.[2]

The third offering along this line was testimony of an administrative support manager, Tim Newens, that, to the best of his recollec-

tion, after the merger of Public and External Affairs, the old Public Affairs flex plan "was just administered to State Government Affairs employees." But, after reviewing the document with which we began our discussion, the State Government Affairs flex plan, he testified:

> The group of documents provides enough information . . . for myself to conclude that the jobs identified here are for contact positions in Government Affairs.

The other bits of testimony purport to show that the SGA flex plan did apply to regional attorneys.

The head of the Communications Policies group in FGA, Michael Baudhuin, said that, as best he could recall, the flex plan was available to all professionals in his group. But from what appears, all such professionals were involved with technology-oriented lobbying with various regulatory staffs and officials. Plaintiff stated in a December, 1993 affidavit that a human resources manager for Law and Government Affairs, Geraldine Fudge, had told her that a regional attorney could be upgraded under the flex plan (presumably of SGA). In an earlier (April, 1993) deposition, however, Fudge had testified that she did not know whether a regional attorney could be upgraded in this manner. An equally dubious piece of evidence submitted by plaintiff was the testimony of T. Waldmann–Williams, a Human Resources District Manager, that regional attorneys fell under "part of" the flex plan, i.e., between grades eight and ten. As to SG 11, the testimony is:

> There is a salary grade eleven in there that I believe it falls under for contact and contact-related types of positions. . . . But I thought that, if I recall right, regional attorneys didn't fall under the SG eleven.

Finally, plaintiff states that "throughout 1991," defendant Brown "was continually making promises of getting an SG 11" for her. Plaintiff argues that, because there were so few SG 11 and SG 12 vacancies at the time, Brown must have been promising to promote plaintiff through the flex plan;

---

2. Moreover, Clossey pointed out the likely inaccuracy of the description of the earlier Public Affairs flex plan as covering "all titles and positions," since this would include non-management employees such as secretaries.

this, in turn, supports the inference that she was eligible for promotion under the plan. This inference approaches the vanishing point, however, in light of Brown's deposition testimony detailing his efforts to gain a promotion for plaintiff by advocating that she receive the Washington, D.C. job offer, by exploring reconfiguring a position that would be an interim step to a Vice Presidency at SG 12, and by discussing the possibility of upgrading the position of Director of Operations Analysis. All of these efforts, Brown testified, were predicated on his basic knowledge that one could not be promoted in place as a regional attorney.

In short, what all this boils down to is that there are a few snippets of testimony that under the old Public Affairs plan it might have been possible for regional attorneys to have been upgraded, although even here it is dubious whether a jury could so find upon a preponderance of the evidence. In any event, the evidence that any such possibility carried over into the new State Government Affairs department is overwhelmingly refuted by the plain facts that no regional attorney was ever so promoted, and that the written description of the flex plan so clearly contemplates lobbyist-type jobs. But plaintiff has yet another alternative argument: her job, because of its numerous "contact duties," in fact came within this description.

### 2. Plaintiff's "Contact" Duties

Plaintiff testified in her deposition, in November of 1992, about her duties as a regional attorney and how they differed from those of a lobbyist. She had done some lobbying, but after she became a full time regional attorney she did not "do" lobbying. She stresses, however, that she talked with some legislators, went to some meetings and hearings, sometimes testified, planned, strategised, negotiated and drafted, reviewed legislative bulletins and bills, decided when additional input was needed, and sometimes drafted "proactive" legislation.

But it was clear to her what the lobbyists did that she did not do: maintain contacts with legislators and staff members; keep an eye on how things were moving through the legislature; recommend to AT & T people who voted in PACs how to distribute PAC dollars; be primarily responsible for understanding the political climate; attend fund raisers regularly, "be[ ] there (in the legislature) on foot;" try to get commitments on how legislators were going to vote in committee or on the floor. She could think of only one legislator with whom she kept more regularly in touch than with others, and even here she would see him only jointly with a lobbyist.

A year later, in December, 1993, plaintiff executed an affidavit, enlarging on her contacts with the legislator, adding another name, and generally asserting "numerous other activities that involved external contacts with state legislators, legislative staff members," and others. This effort to manufacture an issue of fact by adding the gloss of a subsequent affidavit to an earlier deposition is to no effect. As we said in *McCarthy v. Kemper Life Ins. Companies*, 924 F.2d 683, 687 (7th Cir.1991), one cannot by affidavit "effectively oppose a motion for summary judgment by contradicting his own deposition testimony." Plaintiff's present attempt to explain her deposition testimony as referring only to the job of a registered lobbyist does not reach the exculpatory level of confusion or lack of access to all material facts, which we recognized in *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985).

Having carefully considered all of plaintiff's submissions, we conclude that she has failed to put forward enough evidence to justify the inference that defendants failed to promote her because she is a woman. It is questionable whether plaintiff was even eligible for promotion under the plan pursuant to which the lobbyists were promoted. Even if she was, the criteria for promotion seem so overwhelmingly-oriented to lobbyists that, absent other evidence of discriminatory motive, her failure to be promoted logically raises no inference of discrimination. In other words, the theoretical possibility that defendants could have stretched the criteria of the flex plan to promote her to SG 11 does not make their failure to do so gender-based. By its own terms, the flex plan was geared to lobbyists, and, as implemented, it was never used to promote any regional attorneys, male

or female. Furthermore, over the years, plaintiff received very favorable treatment from defendants, including the near doubling of her salary within a six year period, the payment of tuition and grant of necessary time off to allow her to pursue her Ph.D., and an offer to promote her to SG 11 if she accepted a Washington, D.C. position. Finally, there is no direct evidence whatsoever of any discriminatory animus. Based on this record, no rational juror could conclude that defendants failed to promote plaintiff under the flex plan because of her gender. *Cf. Rand v. CF Industries, Inc.,* 42 F.3d 1139 (7th Cir.1994) (granting summary judgment because evidence allows no reasonable inference of discrimination to be drawn).

### D. *Secondary Issues*

Plaintiff also claims discrimination in defendants' failure to invoke the management job evaluation (MJE) procedure on her behalf, asking simply, "Why did not Brown submit Plaintiff's job for an MJE?" This would seem to be an odd question to be asked by the party with the burden of proof. It is no substitute for a preponderance of the evidence. Beyond this, we would make the following observations: (1) the MJE was not used to promote the state directors identified by plaintiff as "comparative employees;" (2) there is no evidence that Brown ever used MJE to promote anyone; (3) there is no evidence of any change in plaintiff's job vis-a-vis other regional attorneys, with the possible exception that she was allowed a paralegal; and (4) there is no evidence that the two men who were promoted via an MJE were "similarly situated." Kindrick, as we have noted, was given lobbying responsibilities which took 80 percent of his time; and Newens had been an administrative support manager, to whom were assigned both human resources and financial duties. No genuine issue of material fact can be generated from this near vacuum.

Finally, plaintiff at some point allegedly learned of a flexible salary plan in the Legal Department and appeals the denial of her discovery requests to obtain it. Plaintiff had left that department in 1985. Whether, had she remained in it, she might have been eligible for promotion under a flex plan, seems entirely irrelevant to the present case. The possibility, suggested by plaintiff, that any Legal Department plan might have extended to attorneys in other departments strikes us as grasping at straws. Rulings on discovery, of course, are particularly within the district court's discretion. In this case, after all the discovery that had taken place, we would be hard put to be critical of putting a stop to further efforts.

Indeed, the time has come to put a stop to our own.

AFFIRMED.