Catherine **WAGNER**, Plaintiff,

v.

The **NUTRASWEET COMPANY,**
Defendant.

No. 92 C 2418.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 29, 1995.

Thomas R. Meites, Joan Harlow Burger, Paul William Mollica, Meites, Frackman, Mulder & Burger, Chicago, IL, Laurie Arden Wardell, Aram A. Hartunian & Associates, Chicago, IL, for plaintiff.

Thomas G. Abram, Richard C. Robin, Edward C. Jepson, Jr., Carlys Elizabeth Belmont, Karen Taylor Donmoyer, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

On March 25, 1991, the plaintiff, Catherine Wagner ("Wagner"), signed a Separation Agreement and a Release of all liability against her employer, the NutraSweet Company ("NutraSweet" or "Company"), the defendant in this case. Wagner subsequently discovered certain facts giving rise to the present lawsuit. On the eve of trial, the parties are before the Court with a second set of summary judgment motions directed to the allegations pled in the Second Amended Complaint. The current issues are:

1. Whether Wagner was terminated on the basis of her sex, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, when Wayne Tompkins, Wagner's male subordinate, assumed a position as Director, Human Resources, of the R & D Group, in late July 1991— approximately three months after Wagner signed a Separation Agreement (which contained a general release of all claims arising on or before March 25, 1991).

2. Whether Wagner was terminated on the basis of her sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, when NutraSweet's Vice President, Joe Clark, refused to consider her for a director position in the Carbonated Soft Drink/Table Top ("CSD") Group, which was ultimately filled by a male, Mike Vinitsky.

3. Whether Wagner was discriminated against with respect to her compensation during her retention period which ran from March 30, 1991 through October 5, 1991, in violation of the Equal

Pay Act, 29 U.S.C. § 206(d), and Title VII, 42 U.S.C. § 2000e *et seq.*

## I. Procedural History

In a Memorandum Opinion and Order dated October 17, 1994, this Court issued several rulings that are relevant to the issues presently before us. *See Wagner v. Nutrasweet Co.,* 873 F.Supp. 87, *reconsideration denied,* 873 F.Supp. 101 (N.D.Ill.1994). With respect to Wagner's compensation claims, the Court previously held that the general release ("Release") signed by Wagner on March 25, 1991, barred any claims arising on or before that date,[1] but did not preclude claims arising during the period of Wagner's retention. *Id.* at 91 n. 4, 102. With respect to the "termination" claims, the Court found that any claims regarding the hiring of Mike Vinitsky in April 1991 as the Director, Human Resources, of the CSD Group ["Vinitsky claim"] and the alleged promotion of Wayne Tompkins in July 1991 as the Director, Human Resources, of the R & D Group ["Tompkins claim"] would be cognizable under the "prospective waiver rule," if these claims arose after March 25, 1991, the date Wagner signed the Release.

The Court then denied NutraSweet's Motion for Summary Judgment as to Wagner on any compensation and termination claims arising after March 25, 1991, and directed Wagner to file a Second Amended Complaint to set forth the remaining claims with more specificity. The parties are now before the Court seeking summary judgment on the three claims alleged in the Second Amended Complaint. For the reasons given below, summary judgment will be granted on the compensation (Count II) and the two termination claims (Count III subparagraph a and b). The Court also grants NutraSweet's request to strike Count I, the class claims, given the Court's previous summary judgment rulings.

**1.** The Court further held that the Release, by itself, could not be rescinded unless Wagner tendered the consideration she received (*i.e.,* the retention pay and the offer of outplacement services which were part of her separation package) in exchange for the Release Agreement. *Wagner,* 873 F.Supp. at 98.

## II. Summary Judgment Standards

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Materiality[2] is determined by assessing whether the fact in dispute, if proven, would satisfy a legal element under the theory alleged or otherwise affect the outcome of the case. *Id.* at 247, 106 S.Ct. at 2509. The Court must view all the evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). If the evidence, however, is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. In an employment discrimination suit, where credibility and in-

**2.** "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509. Factual disputes that are irrelevant or unnecessary are not material. *Id.*

tent are crucial issues, these standards are applied with added rigor. *Courtney v. Biosound,* 42 F.3d 414, 418 (7th Cir.1994) (quoting *Sarsha v. Sears Roebuck,* 3 F.3d 1035, 1038 (7th Cir.1994)).

### III.  The Facts

The following material and undisputed facts have been taken from the Statements of Material and Undisputed Facts filed pursuant to the Northern District of Illinois' Local Rules 12(M) and 12(N).  The relevant period of this lawsuit runs from March 25, 1991 (the date Wagner signed the Release) through October 5, 1991 (the date Wagner's employment with NutraSweet ended).  Only those facts pertinent to Wagner's individual claims are relevant.

### A.  Introduction

NutraSweet, a subsidiary of Monsanto Company, manufactures and distributes an intense sweetener, a fat substitute and certain related products.  12(M) ¶ 1.  In late December 1990, NutraSweet determined that because certain of its patents were to expire in December 1992, a significant reconfiguration of the Company was warranted.  12(M) ¶ 64.  This reconfiguration necessitated the elimination of a substantial number of jobs. *Id.*  Employee terminations resulting from this reconfiguration were announced on March 25, 1991. *Id.*

The reconfiguration affected both the structure and the size of the Company's work force.  For instance, the reconfigured Company was comprised of only four (rather than five) business units: (1) The Carbonated Soft Drink and Tabletop ("CSD") Group, which is responsible for the sale and marketing of NutraSweet sweetener products for use in the beverage and tabletop categories;  (2)

The Food Ingredient Group, which is responsible for the sale and marketing of Nutra-Sweet and Simplesse ingredients to food companies;  (3) Research and Development; and (4) Corporate Staff.  12(M) ¶ 65.  The Research & Development Group was housed at the Mount Prospect, Illinois facility.  12(M) ¶ 5.  The Corporate Staff was housed in Deerfield, Illinois.  12(M) ¶ 3.

### B.  The 1991 Reconfiguration

In early 1991, NutraSweet's company-wide reduction in force began to take effect.  For instance, the number of employees in the Research & Development Group diminished from 220 to 125.  12(M) ¶ 66.  In March 1991, Dr. Mike Losee, the supervisor of the R & D Group, advised Catherine Wagner, then the Director of Human Resources for the R & D Group, that R & D did not need both a director and a manager position. *Id.*  Losee then directed Wagner to determine which position should be eliminated. *Id.*  Wagner subsequently recommended to Losee that the director position be eliminated on the grounds that it would not be a sound business practice to retain a director given the reduced number of employees in R & D.  12(M) ¶ 92.  Wagner further recommended that the human resources function be performed by a senior manager. *Id.*  Wagner also recommended to Losee that Wayne Tompkins fill the senior role in the R & D Group.  12(N) ¶¶ 66–67.[3]  After consultation with Vice President, Joe Clark, Losee accepted Wagner's recommendation to eliminate the director position.  12(M) ¶ 68.  Losee then offered the senior human resources manager position to Wagner, who declined the offer. *Id.;* 12(M) 94.  Wagner rejected the manager position because she did not want to take a step back in her career.  12(M) ¶¶ 66, 94.[4]

---

**3.**  Wagner disputes that she recommended to Losee that her position be eliminated and a Manager, Human Resources position be created in its stead.  Wagner instead contends that Tompkins held a manager position at the time the director position was eliminated and that the choice was not to create a manager position; the choice was who would remain employed at NutraSweet: Wagner or Tompkins.  12(N) ¶ 66.  NutraSweet asserts, and the Court found in its previous opinion, that Tompkins filled a newly created senior manager position at the time the Director posi-

tion was eliminated. *Wagner,* 873 F.Supp. at 93; 12(M) ¶ 66.  For purposes of the pending motions, the Court's framing of the facts is intended to recognize the current dispute.

**4.**  In fact, "although the job had been reduced to a manager level, Losee's offer to Wagner did not entail a salary reduction."  12(M) ¶ 94.  Wagner contends, however, that she believed her total compensation package would have been lower because the Manager, Human Resources posi-

## C. The March 25, 1991, Separation Letter

On March 25, 1991, the plaintiff, Catherine Wagner, signed a Separation Agreement which contained a general release of all claims against the Company prior to the date it was signed in consideration for receipt of the payments outlined. 12(M) ¶ 70. The letter states:

> In consideration of the payments set out in this letter, you, for yourself, your executors, personal representatives, successors and assigns hereby release and absolve the Company, its subsidiaries, affiliates, divisions, employees, officers, directors, successors and assigns from any and all claims, charges, demands, or causes of action, known or unknown, asserted or unasserted, in any way arising from your employment, separation of employment or failure to be recalled or rehired by the company, including but not limited to, all claims which would have been raised pursuant to any common law cause of action or pursuant to any federal, state, or local statute, order, law or regulation. In making this Agreement, you and the Company agree that you were an "employee-at-will" of the Company and not employed pursuant to either a written or oral employment contract.

*Id.* At the time she signed the Agreement, Wagner understood that the Release was intended to prevent her from suing the company for any claims, known or unknown, which arose during her tenure. 12(M) ¶ 71.

## D. The Retention Agreement

Wagner also signed a Retention Agreement. 12(M) ¶ 72. Under the terms of the Retention Agreement, Wagner agreed to remain at NutraSweet through October 1, 1991, to complete various projects with a salary equal to one and one-half times her base salary. *Id.* Wagner also received all payments outlined in the Separation Agreement, including $46,307.69 in severance pay, two months' redeployment pay commencing August 5, 1991, and outplacement services in March or April 1991. 12(M) ¶ 73. In addition to her salary, Wagner further received

retention pay equal to one half the amount of Wagner's separation pay, or $23,153.00, *Wagner,* 873 F.Supp. at 93, as a bonus for remaining with the Company during the retention period. 12(M) ¶ 73. The Court previously found that the Retention Agreement was offered as consideration for Wagner's release. *Wagner,* 873 F.Supp. at 98.

## E. The August 1, 1991, Separation Letter

On August 1, 1991, NutraSweet asked Wagner to sign another Separation Agreement that contained a general release for claims arising during her retention period (*i.e.,* from March 30, 1991, through August 5, 1991). *Wagner,* 873 F.Supp. at 93; 12(M) ¶ 74. Wagner refused to sign this Agreement. 12(M) ¶ 77. The August 1, 1991, Separation Agreement indicated that, although Wagner's job responsibilities in R & D were to cease on August 5, 1991, NutraSweet considered Wagner an employee through October 5, 1991, with severance benefits beginning October 6, 1991. *See Wagner,* 873 F.Supp. at 93 n. 7. In all other respects the Separation Agreement presented to Wagner in August 1991 was the same as the Separation Agreement signed by Wagner in March of the same year. 12(M) ¶ 76. Wagner testified that she refused to sign this Agreement because she believed that NutraSweet had discriminated against her during the retention period. *Wagner,* 873 F.Supp. at 93; 12(M) ¶ 77. Wagner also testified that her belief was based on a conversation she had with Mike Greene, a recruiter, who heard that Tompkins has been promoted to a director position. 12(N) ¶ 78.

## F. Wayne Tompkins

In April 1991, at the time Tompkins was selected to be the senior human resources manager at R & D, he was not offered a director level position nor was he promised a director position by Losee. 12(M) ¶ 98. Sometime during the next year, however, NutraSweet merged the Simplesse Research and Development function into the R & D Group and promoted Tompkins to a Director,

tion, at the time it was offered to her, did not include MIP bonuses. 12(N) ¶ 94.

Human Resources position. 12(M) ¶ 103. In his capacity as Director, Human Resources, Tompkins earned less money than Wagner earned while she held the position, *Wagner,* 873 F.Supp. at 93, even though Tompkins advised Losee that he thought he was underpaid and ultimately received a salary adjustment. 12(M) ¶ 101. In March 1992, the time when NutraSweet admits that Tompkins was promoted to the Director, Human Resources position, 12(M) ¶ 103,[5] Tompkins also received a pay increase. 12(M) ¶¶ 93, 105.

### G. The CSD Director Position

In 1991, as part of the reconfiguration, Rick Darnaby (a Monsanto Company executive who formerly worked in Canada) assumed responsibility for the CSD Group. 12(M) ¶ 79. NutraSweet's chief executive officer, Bob Shapiro, created the Director, Organization Effectiveness[6] position in anticipation of NutraSweet's patent expiring in December 1992 due to the Company's need to examine and redesign its organizational structure and programs to help the company remain successful. 12(M) ¶ 54. Joe Clark, a NutraSweet Vice President, was responsible for supplying Darnaby with candidates for this director position. 12(M) ¶ 79; 12(N) ¶ 122. Openings for director positions at NutraSweet were not ordinarily posted. 12(N) ¶ 121. Employees seeking such interviews normally had to obtain a recommendation for a responsible executive. *Id.* The Director, Organization Effectiveness position in the CSD Group was not posted.[7] *Id.* Darnaby only interviewed those candidates who were recommended by Clark. 12(N) ¶ 122. Clark stressed in those recommendations that Vinitsky had the best organizational development skills, which Darnaby considered to be

80–90% of the job. *Id.* Darnaby ultimately selected Mike Vinitsky to fill the Director, Organizational Effectiveness position in the CSD Group, because he served as the Director, Organizational Effectiveness for the entire company until May or June of 1991. In his former position, Vinitsky was only responsible for both organizational effectiveness functions. 12(N) ¶ 130 Reply. In the CSD director position, Vinitsky was responsible primarily for organizational effectiveness, but also for some human resources functions. 12(N) ¶ 55. Vinitsky had no human resources experience at the time he was selected. 12(N) ¶¶ 48, 131.

### H. Clark's Rejection of Wagner's Candidacy for CSD Director

Wagner learned, in either March or April 1991,[8] that another director level position was going to open up in the CSD Group at NutraSweet. Wagner expressed her interest in the position to Clark. 12(N) ¶ 120 Reply. Dr. Mike Losee, Wagner's supervisor, also recommended Wagner for the position, stressing that Darnaby should be allowed to interview Wagner. 12(M) ¶ 82; 12(N) ¶ 124. Clark, however, refused to submit Wagner's name as a candidate for the position. 12(M) ¶ 83. During Clark's discussions with Wagner about why he would not recommend her to Darnaby for the open director position, Clark said that he did not trust Wagner's "judgment." 12(N) ¶¶ 82, 125 Reply. Clark does not recall whether he told Wagner that he questioned the closeness of Wagner's relationship with Losee. 12(N) ¶ 125 Reply. NutraSweet affirmatively asserts that Clark's reasons for not recommending Wagner to Darnaby were based on his belief that

---

5. The time period when Tompkins was promoted to Director is in dispute. 12(N) ¶ 103. Wagner asserts that the promotion took place in late July or early August 1991. *See Brief In Opposition* at 7 (citing *Wagner,* 873 F.Supp. at 100). NutraSweet contends that Tompkins was not promoted until early 1992. 12(N) ¶ 137 Reply.

6. Wagner claims that this director position was referred to as "Director, Human Resources." 12(N) ¶ 122.

7. Ann Marie Sorcenelli, the Director, Human Resources, of the CSD Group left the company

shortly before Vinitsky filled this position. 12(N) ¶ 122.

8. Wagner claims that she did not learn that the CSD director position opened until "after her termination, in April 1991." 12(N) ¶ 120. NutraSweet contends that Wagner learned of the position in either March or April 1991. 12(N) ¶ 120 Reply. This dispute is material since only claims arising after March 25, 1991 are cognizable given the Court's first summary judgment ruling. However, given the Court's resolution of this issue, *supra,* we need not determine when Wagner learned about the position.

Wagner lacked organizational effectiveness skills and "aligned commitment" (teamwork). 12(N) ¶ 125 Reply. NutraSweet admits, however, that at the time Clark discussed the new position with Plaintiff, he did not ask her about her organizational effectiveness experience pursue her personnel file, or solicit people other than her direct supervisor, Losee, to provide their impressions of her work. 12(N) ¶ 127 Reply. According to Nutra-Sweet, Clark communicated his concerns about Wagner's lack of organizational effectiveness skills to her direct supervisor, Losee. 12(M) ¶ 90; 12(N) ¶ 128 Reply.

## I. Candidates for CSD Director Position

Clark recommended the following candidates for the CSD Group director position to Darnaby: Zada Clarke, Peggy Jude and Mike Vinitsky. With respect to these three candidates, Clark ranked Vinitsky first in terms of organizational effectiveness skills, followed by Clarke and Jude. 12(M) ¶ 88. Jude, however, was ranked first in terms of human resources generalist skills followed by Clarke and Vinitsky. *Id.* Clark admitted that Wagner, who was not considered for the job, had more human resources experience and was more skilled in that area than Zada Clarke. *Id.*

After interviewing the three candidates recommended by Clark, Darnaby chose Vinitsky for the position, 12(M) ¶ 91, even though Vinitsky had no prior human resources generalist experience and was not originally hired by NutraSweet as a generalist, 12(N) ¶ 131, but rather was hired to use his prior experience with organization effectiveness to examine and redesign the entire Company's organizational structure and programs. 12(M) ¶ 54.

## IV. Analysis

There are three remaining claims in this case: a compensation claim and two termination claims. Each claim will be addressed separately.

9. John Russert was a Director, Human Resources for both the Corporate Staff and the

## A. The Compensation Claim

■ The compensation claim, brought under the Equal Pay Act, 29 U.S.C. § 206(d) (1995), and Title VII, 42 U.S.C. 2000e *et seq.* (1995), is based on Wagner's allegation that her retention pay, calculated by her previous base salary, was less than the salary received by her two male counterparts: John Russert[9] and Mike Vinitsky. Although the briefs discuss the relative merits of this claim under the applicable statutes, the Court does not reach the merits of this claim because Wagner has failed to meet her burden of showing that her compensation claim arose after March 25, 1991, the date she signed the Release.

Although it is undisputed that Wagner received retention pay during the retention period after she signed the March 25, 1991, Release, this retention pay was calculated by the base salary Wagner received before March 25, 1991. When Wagner released NutraSweet from liability for any discrimination regarding the amount of her base salary on March 25, 1991, she also effectively released NutraSweet from liability for any discrimination regarding her retention pay. Moreover, Wagner signed the Release knowing that her new retention pay would be based on her previous salary as a director. This Court previously found that the Retention Agreement, including the amount of pay Wagner received during the retention period, was part of the consideration Wagner received for signing the Release. *Wagner,* 873 F.Supp. at 98. Under the "tender rule" discussed in the Court's previous opinion, Wagner is barred from raising these claims since they arose before she signed the March 25, 1991, Release. Wagner was given a second chance to plead additional compensation claims arising after March 25, 1991, and has failed to do so. The Court therefore grants summary judgment in favor of NutraSweet and against Wagner on the compensation claim alleged in Count II because the basis of Wagner's compensation claim depends upon calculations made and agreed to by Wagner before the Release was signed.

NutraSweet Business Group. 12(N) ¶ 34 Reply.

## B. The Sex Discrimination Claims

In Count III, Wagner claims that she is entitled to relief for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* (1995), for two reasons:

1. Following Wagner's termination, Vice President Joe Clark denied her an equal opportunity for a comparable position, ultimately filled by a male, Mike Vinitsky.

2. Although Wagner's position was ostensibly eliminated as part of a reduction in force, her position continued and was filled by her male subordinate, Wayne Tompkins.

*See Brief In Opposition* at 1. In other words, Wagner claims that she was discharged, despite the company-wide reduction-in-force, because of her gender, in violation of Title VII.

### 1. The Vinitsky Claim

In Count III, Wagner's first termination claim is based on a single proposition: Mike Vinitsky, a qualified male, was given the opportunity to compete for an open director position in the CSD Group and ultimately was chosen for it, but Wagner, a qualified female, was not given the opportunity to compete for the position. Wagner's ultimate burden with respect to this claim is to establish that NutraSweet's refusal to consider her for the open director position was based on impermissible gender considerations.

The allegedly discriminatory conduct, according to Wagner, occurred when Joe Clark refused to submit her name as a candidate for the position to Rick Darnaby, along with the names of the other recommended candidates. Thus, Wagner is not alleging that Darnaby's selection of Vinitsky for the position violated Title VII; Wagner is alleging that Clark's refusal to submit her name as a candidate for the position was gender based and therefore discriminatory. Joe Clark,

therefore, is the relevant decisionmaker for purposes of this claim, and the candidate selection process is the relevant conduct.[10] We will begin the analysis with a review of the relevant legal standards.

#### a. Title VII Standards

■ Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ." 42 U.S.C. § 2000e–2. To prove discrimination in Title VII actions, an employee may use either "direct evidence," which means evidence that proves discrimination "without the need for inference or presumption," or circumstantial evidence, which requires inference and presumption. *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736–37 (7th Cir.1994); *Loyd v. Phillips Bros. Inc.,* 25 F.3d 518, 522 (7th Cir.1994). *See also Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989) (noting that the direct and circumstantial methods constitute two distinct evidentiary paths for proving the ultimate issue of discriminatory intent). In a case where the plaintiff offers direct evidence of discrimination, the court will generally analyze the challenged conduct under a "mixed motives" analysis. *Randle,* 876 F.2d at 569. In the more typical case, where the plaintiff offers circumstantial evidence of discrimination, the court analyzes the challenged conduct under the "pretext" or burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The pretext or "indirect" burden-shifting method of proving discrimination, however, is merely a subtype of the circumstantial approach to proving discrimination. *See Troupe,* 20 F.3d at 736 (listing three types of circumstantial evidence, one of which is the "pretext" or "burden-shifting" framework that courts refer to as the "indirect method" of proof). Wagner seeks to prove discrimination in this case

---

10. This distinction is material because the *prima facie* case for a refusal to hire or promote requires the plaintiff to apply "application" for the open position. In this case, Wagner technically was not allowed to apply for the CSD position. We nonetheless construe the "application" requirement broadly and find that Wagner's expressed interest in the position, coupled with Mike Losee's endorsement of Wagner, constituted an application for candidacy, even if Wagner was never actually considered for the CSD director vacancy.

through both the mixed-motives and pretext analysis. We will address the mixed-motives case first.

#### b. The Mixed–Motives Case

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plurality of the Supreme Court held that the words "because of" contained in section 703(a)(1) of Title VII did not require proof that the discriminatory conduct occurred "solely because of" an individual's race, color, religion, sex, or national origin. *Id.* at 241, 109 S.Ct. at 1785. Rather, the Court concluded that "Title VII [was] meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." *Id.* The Seventh Circuit has framed the inquiry in a mixed-motives case as follows:

> where a plaintiff is able to prove through direct evidence that the employment decision at issue was based upon an impermissible factor, he or she has carried the initial burden of proof. At that point, the analysis and burdens associated with the "pretext" inquiry outlined in *McDonnell Douglas* and affirmed in *Burdine* are irrelevant because plaintiff has directly proved that impermissible factors have come into play. . . . "it simply makes no sense to ask whether the legitimate reason was 'the true reason' for the decision—which is the question asked by Burdine." To avoid liability, the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account.

*Randle,* 876 F.2d at 568 (7th Cir.1989).

■ Wagner believes she has direct evidence that NutraSweet, through its agent Joe Clark, refused to consider her for the CSD director position because she was a woman. For example, Wagner asserts that Clark told Losee that Bob Flynn, Nutra-

Sweet's CEO, told Clark that there were "too many attractive women in human resources." 12(N) ¶ 129. Whether and when this comment was made is disputed.[11] 12(N) ¶ 129 Reply. Moreover, when Wagner told Clark why he could not accept Losee's endorsement of her, Clark allegedly retorted that he "questioned the closeness" of Losee's relationship to Wagner. 12(N) ¶ 125. Clark cannot remember whether he made this statement. 12(N) ¶ 125 Reply. Wagner suggests that this comment implies that "Wagner was having an intimate relationship with Losee," *Brief In Opposition* at 3, and "demonstrates Clark's bent to subordinate and disadvantage female executives." *Id.*

■ A plaintiff's *prima facie* case and ultimate burden of proof merge into a threshold question in a mixed-motives case because, unlike the pretext analysis, the burden of proof shifts to the defendant employer only if the plaintiff produces direct evidence that the employment decision was based on an impermissible factor. *See Monaco v. Fuddruckers, Inc.,* 1 F.3d 658, 660 (7th Cir. 1993); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991); *Randle,* 876 F.2d at 568. There are many types of direct evidence that will establish a *prima facie* case. "Stray remarks," courts have held, may, but "do not inevitably," provide direct evidence of a discriminatory employment decision. *Hopkins,* 490 U.S. at 250, 109 S.Ct. at 1791. A plaintiff attempting to satisfy her burden of proof with stray remarks, however, must demonstrate that the discriminatory remarks were made by the decisionmaker, *LaMontagne v. American Convenience Prods.,* 750 F.2d 1405, 1412 (7th Cir. 1984); were related to the employment decision in question, *McCarthy,* 924 F.2d at 686; and were made contemporaneously with that decision. *Smith v. Firestone,* 875 F.2d 1325, 1330 (7th Cir.1989). *See generally Alzona v. Mid–States Corp. Fed. Credit Union,* No. 92

11. NutraSweet argues that this comment is inadmissible hearsay under Fed.R.Evid. 801(d)(2)(D). Wagner asserts that the statement is either an admission by a party opponent or alternatively not hearsay, because it is not offered for the truth of the matter asserted, but for the fact that this comment was made by the CEO (Flynn) to the decisionmaker (Clark). This Court finds that this statement is admissible as non-hearsay. However, as indicated herein, the probative value of this statement is relatively weak.

C 8244, 1995 WL 134767, *6 (N.D.Ill. March 28, 1995).

■ The stray remarks alleged by Wagner do not satisfy these standards and therefore do not "justify requiring the employer to prove that its ... decisions were based on legitimate criteria." *Hopkins,* 490 U.S. at 277, 109 S.Ct. at 1804. First, even if Bob Flynn made the "attractive women" remark, Flynn was not the decisionmaker. Moreover, even though there is some dispute about whether Joe Clark, the decisionmaker, relied on the remark as a basis for his decision, the remark is not material because the plaintiff cannot show that the remark was made contemporaneously with the employment decision at issue.[12] Second, Clark's alleged statement that he questioned the "closeness" of Wagner's relationship to Losee, although not affirmatively disputed, does not raise a reasonable inference of gender discrimination. Wagner wants the Court to believe that the closeness comment implied that Clark refused to consider Wagner because Clark believed Wagner had an intimate relationship with Losee; Wagner then apparently wants the Court to infer that Clark's belief is evidence of stereotypical gender discrimination. This proposed chain of inferences leads the Court down the classic "slippery slope" and therefore will not be accepted. Gender discrimination, although often manifested by stereotypical attitudes, must be proven by evidence which clearly treats one gender differently than the other based on the characteristic of sex, rather than on other bases, such as mere dislike, differences of opinion, or other undefinable attributes. The "closeness" remark, especially when considered in the context of Clark's remark about Wagner's lack of "judgment," falls into a category of stray remarks that do not appear to be based merely on gender related and therefore prohibited considerations.

Wagner has failed to satisfy her threshold burden by offering direct proof of gender discrimination—for instance, a remark by Clark (the decisionmaker) to Losee or Wagner (explaining the refusal to consider) made contemporaneously with the challenged refusal that would raise the inference of gender discrimination. The remarks Wagner offers, however, do not satisfy these standards and therefore cannot sustain Wagner's case under a mixed-motive analysis. Given that these two remarks are Wagner's only direct evidence of discrimination, this Court finds that she has failed to establish a *prima facie* case of gender discrimination under the mixed-motives method.

### c. The Pretext Case

■ The pretext or indirect burden-shifting method of proof set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), assigns the burden of proof to the plaintiff and requires the plaintiff to bear the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* In a case where the plaintiff alleges that the employer refused to hire or promote her, the plaintiff must show: (1) application by plaintiff to fill a vacancy; (2) qualification; (3) rejection; (4) continued efforts by employer to seek applications with plaintiff's qualifications. *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 228 (7th Cir.1995). Although the *prima facie* case is not "inflexible" and is often modified to accommodate varied fact patterns, *Texas Dept. of Community Affairs*

---

12. Although Wagner now asserts that Losee related this remark to her "shortly after [she] was denied an opportunity to interview for the job, in April of 1991," 12(N) ¶ 129, in her second deposition, taken on December 4, 1992, she testified that her conversation with Losee "must have been around the [reconfiguration] process, the planning process." *See id.* at Reply. The Seventh Circuit has held that "a party may not create a genuine issue of fact by contradicting [her] own earlier statements, at least without a plausible explanation for the sudden change of heart." *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988). Wagner's current assertion cannot create a genuine issue of fact because her earlier deposition testimony places the conversation with Losee several months prior to the time that Clark made his decision to exclude Wagner from consideration for the CSD position. Moreover, even if Losee's statement to Wagner were found to be contemporaneous with the adverse employment decision, Losee merely related Clark's statement to Wagner; there is no objective evidence that Clark related the Flynn statement to Losee at or near the time Clark decided not to submit Wagner's name as a candidate for the position.

*v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1093 n. 6, 67 L.Ed.2d 207 (1981), the evidence offered to make out the *prima facie* case must raise an inference of discrimination. *Cherry,* 47 F.3d at 228. To raise this inference, the plaintiff "must show that as a female she was treated differently than a similarly situated male." *Id.* (citing *Chambers v. American Trans Air Inc.,* 17 F.3d 998, 1003–04 (7th Cir.1994)).

Once the *prima facie* case is successfully established, this inference of discrimination must be rebutted by the defendant employer. *Id.* A burden of production thus shifts to the defendant employer to articulate a facially legitimate, non-discriminatory reason for its action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant satisfies this burden, then the presumption of discrimination created by the *prima facie* case is dissolved, and the ultimate burden of proof falls on the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). To establish pretext, the plaintiff must show that the asserted reason was both false and that discrimination was the real reason. *Id.*

Wagner's gender discrimination claim against NutraSweet regarding the selection of Mike Vinitsky for the CSD director position must fail because the evidence Wagner offers to satisfy her *prima facie* case does not raise an inference of gender discrimination. A presumption of gender discrimination exists only if Wagner can show that because she is a woman Clark treated her differently than Mike Vinitsky when he selected candidates. The facts of this case

simply do not warrant such a presumption. First, Joe Clark submitted the name of Mike Vinitsky and the names of two other qualified female applicants for the CSD position. He therefore did not select candidates based solely on gender and therefore did not discriminate on the basis of sex. At most, the evidence shows that Clark refused to select Wagner as a candidate for a reason other than her qualifications.[13] This "other" reason, however, has not been linked to gender bias, since other females were selected who were qualified applicants rather than mere decoys.[14] Rather, the record supports the inference that Wagner was not selected as a candidate because Clark questioned her judgment and her relationship with Losee. These grounds are, although not necessarily justified, certainly not actionable under Title VII. *See, e.g., Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). The portion of Count III (subparagraph a) charging NutraSweet with violating Title VII for failing to consider Wagner for the CSD director position is therefore denied.

### 2. The Tompkins Claim

In Count III, Wagner's second termination claim is that she was terminated because of her gender, in violation of Title VII, when NutraSweet filled her former position of Director, Human Resources for the R & D Group with her male subordinate, Wayne Tompkins, in July 1991. Wagner seeks to prove the Tompkins claim, like the Vinitsky claim, by using the mixed-motives and pretext methods.

### a. The Mixed–Motives Case

Wagner asserts that NutraSweet discriminated against her on the basis of

---

**13.** In fact, Wagner's qualifications appear to have been equal to and, with respect to her human resources skills, better than those of Zada Clarke and Mike Vinitsky. 12(M) ¶ 88; 12(N) ¶ 48.

**14.** If Mike Vinitsky had been the only candidate with organizational effectiveness skills, concededly a high percentage of the CSD director position, 12(M) ¶ 80, the selection of female ap-

plicants without these skills, and the rejection of plaintiff who, at least facially, appeared to have some of these skills, would allow Wagner to satisfy her *prima facie* case. The record, however, does not support this finding, since the other female applicants had some organizational effectiveness skills in addition to human resources experience. 12(M) ¶ 88.

gender because Losee did not tell her that another director position would be available in the near future when she recommended the elimination of her director position to Losee and refused Losee's offer of the senior manager role. *Brief In Opposition* at 7–8. Although Losee denies knowing that another director position would become available, 12(M) ¶ 98, Wagner now contends that Losee concealed this information because Losee harbored sex based stereotypes about Wagner. For instance, Wagner contends that Losee "held up a promotion for Wagner due to her pregnancy in 1986, saying that she could not expect to work and take care of small children." *Brief In Opposition* at 8 (citing 12(N) ¶ 115). Wagner also claims that in 1988 her MIP bonus was reduced "because she was absent from the office for maternity leave (even though she continued to work at home during that time)." *Id.* According to Wagner, Losee said she was "lucky to get what she got." *Id.* (citing 12(N) ¶ 194). Finally, in 1989, Losee allegedly commented to Wagner that "he did not worry about her needing a raise because between her and her husband, they were making enough." *Id.* Losee denies making these statements. This evidence, however, does not raise a genuine issue of material fact because the timing of these comments, even if made, was not contemporaneous with either the elimination of Wagner's director position or the alleged creation of the director position for Tompkins once Tompkins filled the senior manager role in the R & D Group. Wagner therefore does not have mixed-motive case.

#### b. The Pretext Case

In a reduction-in-force case, a plaintiff establishes her *prima facie* case by showing that: (1) she was a member of a protected class; (2) she was satisfactorily performing the duties of her position; (3) she was discharged; and (4) her employer sought a male replacement for her. *See Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1113 (7th Cir.1992); *Williams v. Williams Elec. Inc.,* 856 F.2d 920, 922 (7th Cir.1988); *La-Montagne,* 750 F.2d at 1408. Although Wagner satisfies the first three elements of her case, the fourth element cannot be met on the record before the Court.

At the time Wagner was terminated, her director position was eliminated; it was not filled by Wayne Tompkins. Instead, Tompkins, already a manager in the R & D Group, was promoted to the position of senior manager, a position which incorporated some but not all of Wagner's former duties as Director, Human Resources. For example, Wagner's position as director included responsibility for safety, health, environmental affairs and facilities administration. 12(M) ¶ 16. When Tompkins assumed the senior manager position in April 1991, Wagner's responsibilities for environmental safety, health and industrial hygiene were not assigned to him, 12(M) ¶ 97, although Wagner contends that Tompkins was offered these responsibilities in the fall of 1991. 12(N) ¶ 97. Rather, at the time Wagner agreed to separate from NutraSweet, Tompkins' duties merely included recruiting, human resources duties, training and development. 12(M) ¶ 100. To establish the fourth element of her prima facie case, Wagner would need to develop a record showing that Tompkins, her purported replacement, actually performed her former duties when she held the position of director. *See Hawkins v. Ceco Corp.,* 883 F.2d 977, 982 (11th Cir.1989), *cert. denied,* 495 U.S. 935, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990). Wagner has not developed such a record. Further, although Tompkins was the senior person in the R & D Group after Wagner's director position was eliminated, Tompkins was not paid the same salary Wagner had been paid as director, nor was he given that title. *Wagner,* 873 F.Supp. at 93. Given these undisputed facts, the Court finds that Wagner's discharge cannot be connected to any efforts by NutraSweet to "replace" her with Tompkins, in violation of Title VII.

Similarly, Wagner's conspiracy theory, although appealing on its face, lacks substance. Wagner claims that NutraSweet never intended to eliminate her position as Director, Human Resources; instead, according to Wagner, it was NutraSweet's intention to eliminate her, a woman, with the director position, fill a subordinate senior manager role with a male employee, and then promote that employee to director after Wagner had

been discharged. The facts simply do not bear this theory out. First, Losee gave Wagner the decision about which position to eliminate: her own director position or the senior manager role. Wagner recommended that her position be cut. 12(N) ¶¶ 66–67. This fact is not disputed. Second, Losee offered the remaining senior manager role to Wagner, but she refused it for her own reasons. 12(M) ¶¶ 66, 94. Given these undisputed facts, the Court cannot conclude that NutraSweet had a motive to discriminate against Wagner by eliminating her as an executive simply because she was a woman. To the contrary, NutraSweet gave Wagner every opportunity to remain employed in the R & D Group. It was Wagner who chose to resign; NutraSweet did not terminate her employment until after she had made this decision. Although there is presently a genuine issue as to *when* Tompkins became the Director, Human Resources, in late July 1991 or in early 1992,[15] this issue is not material. Therefore, the portion of Count III (subparagraph b) claiming gender discrimination against NutraSweet with respect to Wayne Tompkins is therefore granted.

### V. Conclusion

This order puts an end to nearly three years of litigation. It is unfortunate that this case, which was not always before this Court, must be terminated on summary judgment at such a late stage in the proceedings. The Court fully understands that Ms. Wagner may not have been treated fairly during her tenure at NutraSweet, however, fairness is not the issue to be decided in an employment discrimination case. Rather, this court must apply Seventh Circuit precedent to reach a determination on the merits. We believe that the result reached in this case correctly applies the rulings of the Circuit Court to the facts of this case.

Therefore, for the reasons given above, the Clerk of the Court is directed to enter summary judgment in favor of the defendant, the NutraSweet Company, and against the plaintiff, Catherine Wagner, on Counts II and III of the Second Amended Complaint. Count I

of the Second Amended Complaint is stricken because it contains class allegations that the Court denied in its orders dated October 13, 1994, and November 23, 1994. *Wagner,* 873 F.Supp. at 100–102. This case is terminated. Each party is to bear their own costs.

---

**15.** The Court previously found that Tompkins was named to the director position in late July 1991. *Wagner,* 873 F.Supp. at 93.