Casell RANDLE, George Austin and
Holmes Communications,
Plaintiffs–Appellants,

v.

LaSALLE TELECOMMUNICATIONS,
INC., d/b/a Chicago Cable TV,
Defendants–Appellees.

No. 88–3221.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1989.

Decided May 30, 1989.

As Corrected June 2, and July 10, 1989.

Anthony S. DiVincenzo, Chicago, Ill., for plaintiffs-appellants.

Julie Badel, McDermott Will & Emery, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

As a condition for obtaining a cable television franchise with the City of Chicago, a prospective grantee must agree to use its best efforts to award at least twenty five percent (25%) of the dollar value of its contracts to entities qualifying as a Minority Business Enterprise ("MBE"), and at least five percent (5%) to entities constituting a Women's Business Enterprise ("WBE"). Robin Holmes, a black woman who worked as a cable service sales supervisor for Group W, borrowed money and established Holmes Communications ("Holmes"). Holmes, which qualified as both a MBE and WBE, then contracted to provide cable marketing services to LaSalle Telecommunications ("LaSalle"), a cable franchise grantee doing business with the

City as Chicago Cable TV. Less than nine months later, Holmes was in dire straits. When Holmes defaulted on its contractual obligations, LaSalle terminated the contract after giving Holmes notice. LaSalle's termination letter was largely moot; Holmes had already gone out of business. After that, Holmes and two of its employees brought suit against LaSalle, alleging that the defendant discriminated against them because of their race in violation of 42 U.S.C. § 1981. This appeal is from the district court's grant of summary judgment on behalf of the defendants, 697 F.Supp. 1474 (1988). We affirm.

## I. Background

In her deposition testimony, Robin Holmes stated that during her last year as a sales supervisor for Group W, she focused on the preliminary research, leg work, and preparation for establishing her own cable television marketing business. Some of her initial steps included interviewing with LaSalle and meeting with its representatives on a number of occasions. Ms. Holmes also conducted discussions with George Austin, a black sales associate at Group W, about working for her new company. Group W became aware of these developments and responded by instituting a policy prohibiting any of its sales associates from working for another cable company while still in its employ.

Robin Holmes, George Austin, and Casell Randle, another one of Group W's black sales associates who attempted to work for Holmes, were aware of this policy. All three were also aware of a policy agreement between Group W and LaSalle whereby LaSalle would not hire any employees leaving Group W for at least sixty days from the date of their departure. Ms. Holmes believes that this agreement was made in response to Group W's fear that there might be a "mass exodus" of its salespeople to her company. She also believes that Group W wanted to make it as

difficult as possible for her to succeed in starting her own business. Finally, all of the plaintiffs have concluded that Austin and Randle were the primary targets of the sixty-day limitation because they were the top sales associates at Group W.

In spite of their knowledge of Group W's prohibition against working for another cable company, Austin and Randle started to work for Holmes on a part-time basis when she struck out on her own in January of 1986. Group W got wind of this development and confronted Austin and Randle, who lied about their divided loyalties. Group W then conducted an investigation into the matter and terminated the two after confirming their employment with Holmes. Before Austin and Randle could begin working for Holmes full-time, representatives from LaSalle reminded Robin Holmes about the sixty-day agreement between the two companies. They suggested to her that "it would be a good idea if you let these guys go" for the sixty-day period. Ms. Holmes stated that this conversation left her with the impression that if she would do this "favor" for LaSalle, it would respond by continuing to pay her sales invoices as expeditiously as it had been doing. Ms. Holmes concluded that it would be "in the best interests of Holmes Communication" to lay-off Austin and Randle for sixty days since her company was running on a "shoestring" and LaSalle's prompt payment on her invoices, sometimes in less than twenty-four hours, was vital to its survival. In fact, as further assurance that she would receive prompt payment from LaSalle, Ms. Holmes later agreed to and signed an amendment to her contract: she accepted five dollars less in commission on the sale of each "tarket package" in return for payment on her invoices within ten days rather than the sixty-day period originally contained in the contract.

Sometime after Holmes contracted to provide sales services to LaSalle,[1] the latter

---

**1.** The pertinent provisions of the contract provided that LaSalle was to issue sales leads to Holmes in "batches," which Holmes would work "until at least 90% of the leads in such

batch have been finalized [including a definite refusal or lack of contact after three attempts] or 40%" have been sold cable TV services. Holmes was given the exclusive rights to the

began to develop its own in-house sales force. Ms. Holmes stated that LaSalle had initially provided her company with productive territories, which included lower income and predominately black areas. However, once LaSalle got its own sales force up and running, it began assigning less desirable sales territories to Holmes. Ms. Holmes came to this conclusion after driving through the assigned territories in a car and comparing the areas "where they [LaSalle's in-house sales force] were working versus where we were working." Ms. Holmes also talked to sales associates from LaSalle about their assignments. She surmised that her company was being assigned the dregs: whatever was "left over," "whatever they didn't want." For example, she stated that her company received assignments in the more affluent white neighborhoods, and that these were unproductive territories because they either had a background of racial tension, or the residents typically did not subscribe to cable television. Her opinion of how the sales territories should have been allocated is reflected in the following deposition testimony:

> I had perhaps seven maybe ten reps. I would say a third of them were white, I would say a third of them were Hispanic and a third were black so that I could have a fair representation of the people that we were selling to so that I could place—to be most effective—I could place Hispanic reps in Hispanic areas, black reps in black areas and white reps in white areas.
>
> What happened was we were given the area that was predominately white with a history of racial tension, and with that problem that is an area that should be sold by white reps. If it is a white area and there is racial tension, that should be white reps. If it is a black area with racial tension, it should be black reps.

When asked to explain why she thought LaSalle had assigned less desirable territo-

ry to her company, however, Ms. Holmes stated that she thought Bill Gerski, LaSalle's Subscription Sales Manager, wanted to rely upon his in-house sales force to make himself look good. She also recognized that LaSalle could sell subscriptions "cheaper [in-house] because of the cost per sale that they were giving me versus what they were paying their in-house sales representatives." She testified that under her contract, she received fifty percent more per sale because of her expenses. Finally, when asked whether she had any reason to believe that her race had anything to do with the way LaSalle allocated territory to her company, Ms. Holmes could only highlight "intangibles," such as the way LaSalle representatives spoke to her and the tone in their voices. She stated, for example, that when Gerski talked to her, it was "not so much what he said, but the way he said things, his condescending nature." She also stated that this treatment might well have been attributable to the fact that she was a woman rather than the fact that she was black.

By the end of the summer of 1986, LaSalle received indications that Holmes was struggling as a viable subcontractor. For example, a number of Holmes' employees had sought employment at LaSalle because they had not been paid in as many as four weeks. On August 5, 1986, Peter Jenkins, the sales manager for LaSalle, sent a letter to Robin Holmes, noting that he had been unable to reach her by phone over the preceding two days. Jenkins went on to state that LaSalle was concerned about the numerous inquiries by Holmes' employees as well as

> the out come [sic] of the forty or so leads that you picked up on Friday August 1, 1986. As of this writing, we have only one sale.
>
> If I do not hear from you by thursday [sic] morning, August 7, 1986, I will have no choice but to re-issue the sales routes given to you on July 25, 1986 and request

area for a period of ninety days, but was required "to solicit subscriptions within assigned areas with reasonable diligence." With reference to the life of the contract, either party could terminate for any reason within thirty

days of written notice, or after three days upon the insolvency of either party. LaSalle, at its sole option, could declare a default and terminate within twenty-four hours of notice.

you return all unworked leads immediately.

Robin Holmes did not receive Jenkins' phone calls or letter because she had been locked out of her office by her landlord for failing to pay rent. She did not attempt to pick up Holmes' mail or otherwise reach LaSalle because, in her words, she gave up on the company and went into seclusion. Ms. Holmes stated that once her sales associates had all left and she found out about being locked out, her attitude was "to hell with it." When Ms. Holmes failed to respond to the August 5 letter, LaSalle wrote to her on August 8, 1986, to inform her that it was terminating its contract with Holmes because her company was in default.

Randle, Austin and Holmes Communication filed suit against Group W and LaSalle, originally alleging violations of Section 1 of the Sherman Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. These claims were ultimately dismissed after Group W settled with the plaintiffs. In their fourth amended complaint, the plaintiffs pressed three remaining breach of contract claims pendent to their contentions under 42 U.S.C. § 1981. They allege that the following acts by LaSalle violated § 1981 by interfering with their rights to freely contract: (1) LaSalle forced Holmes to terminate Austin and Randle for a sixty-day period, (2) LaSalle unilaterally reduced the schedule of commission to be paid to Holmes, (3) LaSalle arbitrarily limited the territories Holmes could work, and (4) LaSalle improperly terminated its contract with Holmes.

On February 19, 1988, LaSalle moved for summary judgment. After reviewing the evidence, the district court rejected plaintiffs' contention that they had presented direct evidence of discrimination sufficient to render the indirect method of proof outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), inapplicable to their claims under § 1981. *See Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Therefore, the court analyzed the evidence under the indirect method of proof and granted summary judgment on behalf of LaSalle on the § 1981 claims. The court then dismissed the pendent state law counts for want of subject matter jurisdiction.

On appeal, the plaintiffs-appellants contend that the district court erred in granting summary judgment. They begin by challenging the district court's conclusion that their proffered evidence was not direct evidence of LaSalle's discriminatory intent. Alternatively, they argue that the district court misapplied the standard for summary judgment and that summary judgment was improper because they established that defendant's legitimate, nondiscriminatory reason for terminating the contract was pretextual.

## II. Analysis

The appellants' arguments on appeal revolve around the contention that summary judgment is generally inappropriate in cases where proof of the defendant's intent is central to the case. Because this contention misapprehends the limitations upon summary judgment in discrimination cases involving the *McDonnell Douglas* framework, we begin by outlining the applicable standard. In reviewing the propriety of the district court's grant of summary judgment, this court must examine the entire record to determine whether any genuine issues of material fact exist. Fed. R.Civ.P. 56(c). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). If the nonmovant bears the burden of proof on an issue, however, he or she may not simply rest on the pleadings; rather, the nonmovant must affirmatively set forth specific facts that show that there is a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

To determine whether any genuine issues of material fact exist, we must turn to the substantive law and burdens of proof governing appellants' claims under § 1981. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Since proof of defendant's discriminatory intent is at issue, the application of the foregoing principles will be reviewed with special caution because intent is generally subject to proof only though circumstantial evidence. *Friedel v. City of Madison,* 832 F.2d 965, 972 (7th Cir.1987). That is not to say, however, that summary judgement is never appropriate in such cases. The initial elements of the prima facie case are relatively simple to prove. The elements and the subsequent "shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'" *Trans World Airlines Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985) (quoting *Leob v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979)). Thus where the nonmovant is unable to establish at least the minimal elements of the prima facie case under the *McDonnell Douglas* methodology, the entry of summary judgment is required. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. It is axiomatic that there can be no genuine issues of material fact if the plaintiff is unable to establish a prima facie case "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553. With these principles in mind, we turn to the substantive law governing appellants' claims.

■ As indicated above, a plaintiff must prove that he or she is a victim of intentional discrimination to ultimately prevail on a claim under 42 U.S.C. § 1981.[2] *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 510–11 (7th Cir.1986). It is well settled that the methods and order of proof applicable to a claim of disparate treatment[3] under Title VII are equally availing under § 1981. *North v. Madison Area Ass'n. for Retarded Citizens—Developmental Centers Corp.,* 844 F.2d 401, 408 (7th Cir.1988); *Friedel,* 832 F.2d at 972; *Yarbrough,* 789 F.2d at 511; *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1307 (7th Cir.1985); *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 364 (7th Cir.1983). In a decision rendered after the parties presented oral arguments in the present case, the Supreme Court clarified the methods of proof available to a plaintiff pressing a claim of disparate treatment under Title VII.

■ In *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court addressed the conflict among the circuits regarding the appropriate allocation of the burdens in a Title VII case involving "mixed motives." A plurality of the Court held that the words "because of" contained in § 703(a)(1) of Title VII did not require proof that the conduct proscribed be *"solely because of"* an individual's race, color, religion, sex, or national origin. The Court emphasized that "Title VII was meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." *Id.* at ——, 109 S.Ct. at 1785. Thus where a plaintiff is able to prove through direct evidence that the employment decision at issue was based upon an impermissible factor, he or she has carried the initial burden of proof. At that point, the analysis and burdens associated with the "pretext" inquiry outlined in *McDonnell Douglas* and affirmed in *Burdine* are irrelevant because plaintiff has directly proved that impermissible factors have come into play. The Court stated that "it simply makes no

2. In pertinent part, § 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, ... as is enjoyed by white citizens,...."

3. The court has defined "disparate treatment" as "the most easily understood type of discrimination. The employer simply treats some people

less favorable than others because of their race, color, religion, sex, or national origin.... Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

sense to ask whether the legitimate reason was 'the true reason' for the decision—which is the question asked by *Burdine*." *Id.* at ——, 109 S.Ct. at 1788–89. To avoid liability, the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account. *Id.* at ——, 109 S.Ct. at 1795.

The Court's decision in *Hopkins* makes it clear that a case involving an initial offer of direct evidence of discrimination is quite distinct from one in which the plaintiff must rely upon the indirect method of proof established in *McDonnell Douglas.* These two methods of proof constitute "different evidentiary paths" available to a plaintiff seeking to prove the ultimate issue of defendant's discriminatory intent. *Terbovitz v. Fiscal Court of Adair County,* 825 F.2d 111, 115 (6th Cir.1987) (quoting *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985)). In an attempt to mitigate the confusion that might arise from the availability of these different paths, the Court outlined the procedural logistics that will likely come into play in disparate treatment cases:

> Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' or a 'mixed motives' case from the beginning in the District Court; indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both. Discovery often will be necessary before plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her. At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives. If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine,* that the employer's stated reason for its decision is pretextual.

*Hopkins,* —— U.S. at —— n. 12, 109 S.Ct. at 1789 n. 12.

▆ This is exactly the course that the district court followed in the present case. The court began by determining whether appellants' proffered evidence was "direct" evidence of discrimination. *See e.g. Mullen v. Princess Anne Volunteer Fire Co.,* 853 F.2d 1130, 1138 (4th Cir.1988) (direct evidence cases force the court to struggle with the semantics of what constitutes "direct" rather than "indirect" or "circumstantial" evidence). The court noted that by definition, direct evidence, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. Therefore, the district court held that to render the indirect method of proof of *McDonnell Douglas* inapplicable, a plaintiff's so-called "direct" evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question. We believe that these two requirements are consonant with the Supreme Court's decision in *Hopkins:*

> Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be evidence that gender played a part. In any event, the stereotyping in this case did not simply consist of stray remarks. On the contrary, Hopkins proved that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked evaluations. That is not, as Price Waterhouse suggests, "discrimination in the air"; rather it is, as Hopkins puts it, "discrimination brought to the ground and visited upon the employee."

*Hopkins,* —— U.S. at ——, 109 S.Ct. at 1791. *See also Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1549 (10th Cir. 1987) (discriminatory statements unrelated to the challenged employment decision are

not direct evidence of causation because inference was required); *Robinson v. Montgomery Ward and Co., Inc.*, 823 F.2d 793, 797 (4th Cir.1987) (discriminatory remarks did not constitute direct evidence of intentional discrimination); *Maxfield v. Sinclair International*, 766 F.2d 788, 791 (3rd Cir.1985) ("Direct evidence would include statements by employer to employee that s/he was being fired because of age."); *Lee v. County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982) (direct testimony that defendants acted with discriminatory intent requires no inference).

◼◼◼ In light of these two requirements, it is evident that appellants' proffered evidence of LaSalle's discriminatory intent was not direct evidence of discrimination relating to the employment decision at issue. Appellants point to numerous instances where LaSalle managers made racially or ethnically derogatory remarks to or in front of their own employees. For example, Joseph Hernandez stated in his affidavit that he was present when Ellis remarked that the way "things are going, [LaSalle] will soon be all black." Ellis also rejected the LaSalle employees' request to celebrate Dr. Martin Luther King Jr.'s birthday as a holiday with the comment that "pretty soon everyone will want a Pulaski Day." Although these comments may well serve as circumstantial proof of Ellis' discriminatory animus, they are completely unrelated to the employment decision challenged by the appellants.[4]

Similarly, a comment that Gerski made directly to Robin Holmes during a conversation she had with him about her territory assignments on January 29, 1986, does not constitute direct evidence of discrimination. Gerski stated that Holmes' contract "meant nothing to him, it was just a piece of paper, and [she] should be grateful for whatever it is that [she] get[s]." Although this statement suggests that Gerski did not respect the value of Holmes' contract, it does not speak to Gerski's discriminatory intent; it is simply not possible to tell whether the statement was racially motivated. Moreover, the statement does not prove, at least without relying on a number of inferences, that LaSalle's alleged acts many months later were the product of intentional racial discrimination. In sum, the "stray remarks" that appellants highlight do not constitute direct evidence of discrimination. Therefore, the district court was correct in its determination that the *McDonnell Douglas* methodology applied to this case, the issue to which we now turn.

◼◼◼ Under *McDonnell Douglas*, a plaintiff may establish a prima facie case of disparate treatment in the termination of her employment by showing (1) that she was a member of the protected class, (2) that she was doing the work well enough to meet the employer's legitimate expectations [or her contractual obligations], (3)

---

4. The district court determined that two other statements involving Ellis were not direct evidence of racial discrimination against Holmes. The first stems from Ms. Holmes' deposition testimony that Winslow Jefferies, a marketing manager at LaSalle, told her that Ellis stated in a meeting that "if he had his way he wouldn't deal with any of them [women or blacks] ..." The second statement is contained in the affidavit of Hernandez, who alleged that Jefferies told him that a meeting took place in which Ellis and other executives "reached a consensus that steps would be taken" to ensure that MBEs and WBEs would not receive a fair share of the franchise agreement with the City. However, Hernandez did not state when this meeting took place, what the steps would be, or whether they would be directed toward Holmes. The defendants contend that these statements are not competent evidence within the parameters of Rule 56 because they are hearsay. We agree. Rule 56(e) requires that supporting evidentiary affidavits "shall set forth facts as would be admissible in evidence." Based on this requirement, our cases have stressed that we are unable to consider hearsay statements that are not otherwise admissible at trial. *Friedel*, 832 F.2d at 970–71 (citing cases); *Liberles v. County of Cook*, 709 F.2d 1122, 1129 (7th Cir.1983) (citing 10A Wright & Miller, Federal Practice and Procedure § 2738 pp. 467–74 (1983)). The same limitation applies to deposition testimony based on inadmissible hearsay. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, ¶ 56.11[4] (2d ed. 1988). In any event, even if we were able to properly consider these statements, we would agree with the district court that they do not constitute direct evidence relating to the employment decision at issue.

that, in spite of her performance, she was discharged, and (4) that her employer sought a replacement for her. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984) (ADEA case adapting *McDonnell Douglas* factors for a discharge case). We agree with the district court's conclusion that appellants failed to satisfy these elements.[5] In fact, Ms. Holmes' testimony itself reveals that her company was not meeting LaSalle's legitimate expectations. Our own review of the evidence confirms that LaSalle acted well within its contractual rights when it terminated Holmes for default. Holmes' sales associates were seeking employment at LaSalle because they were not being paid, and Holmes was not producing sales in its last batch of assigned territories. Ms. Holmes could not be reached to discuss these developments. LaSalle's August 5 letter inquiring about them sought Ms. Holmes' response and gave her notice of LaSalle's intent to terminate. LaSalle's subsequent termination letter dated August 8 gave Holmes adequate time under the default provision of the contract.

Appellants' response to all of this is that "but for" LaSalle's arbitrary assignment of territories to Holmes, the company would not have gone out of business. However, this contention is unavailing absent a claim that Holmes was given these assignments on the basis of race.[6] Work assignments made in an arbitrary manner, without more, do not give rise to an inference of discrimination. *Friedel*, 832 F.2d 965, 974 (misapplication of a policy and arbitrary dismissal do not give rise to liability). On this point, we are troubled by both Ms. Holmes' deposition testimony and the suggestion underlying this claim. Ms. Holmes stated that her company, after receiving initial assignments in black neighborhoods, was later assigned to predominately white neighborhoods. Impliedly, the argument here is that as an MBE, Holmes was entitled to continued assignments in the black areas of the City. We do not believe that the MBE and WBE provisions within the City's franchise agreement with LaSalle required that the neighborhoods of Chicago be carved up and parcelled out on the basis of their racial composition. Indeed, the claim to such an entitlement under 42 U.S. C. § 1981 would surely turn the Civil Rights Act of 1866 on its head. The overriding goal of the 39th Congress was to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976).

Accordingly, the district court's grant of summary judgment in favor of the defendants is hereby AFFIRMED.

---

5. Appellants' first two contentions in support of their claim under § 1981 are spurious in light of the record in this case. Ms. Holmes' contention that LaSalle "forced" her to terminate Austin and Randle is contrary to her own admission that she responded to LaSalle's suggestion under the belief that such a "favor" to them would be in the best interests of her company. Similarly, Ms. Holmes' claim that LaSalle unilaterally reduced her company's sales commissions is factually frivolous since Ms. Holmes agreed to and signed the amendment to her contract in order to assure prompt payments from LaSalle.

6. Appellants' claim that they were assigned to certain territories already worked by LaSalle's in-house sales force fails to meet this burden. To begin with, Ms. Holmes stated that Gerski's reason for employing his in-house sales force was not based on racial considerations, rather he intended to make himself look good as Sales Manager. Ms. Holmes also recognized that her company's commission was fifty percent higher per sale than that paid to the in-house force. Finally, it is important to note that Holmes' contract with LaSalle did not cover the quantity or characteristics of the territories to be assigned, nor did it prohibit the assignment of previously worked territory.