**GOLD STAR TAXI AND TRANSPORTATION SERVICE, et al., Plaintiffs,**

v.

**MALL OF AMERICA COMPANY, et al., Defendants.**

**No. Civ. 3–96–895.**

United States District Court,
D. Minnesota,
Third Division.

Dec. 18, 1997.

Douglas Anderson Hedin, Daniel S. Goldberg, Elizabeth Glidden, Hedin & Rubenstein, Minneapolis, MN, for Gold Star Taxi and Transp. Service Corp., Abdulqadir Abdi, Mustafa O. Abdu, Osman Ahmed, Nabil Ali, Samy Aly, Abdi Mohamed Askar, Dube Balle, Nidal Hasan Dama, Amjed Dama, Rocky Edstrom, Abdullahi A. Elmi, Liban Gedi, Makonnen Gelalcha, Abdulahi A. Hersi, Mohamed Jame, Nur A. Igal, Bashif Khalif, Abdirizak Shekh, Alinoor Yusuf.

Daniel S. Goldberg, Hedin & Rubenstein, Minneapolis, MN, for Maran A. Siad.

John M. Sheran, Blake Shepard, Jr., Daniel L. Palmquist, Jeffrey E. Grell, Leonard Street & Deinard, Minneapolis, MN, for Mall of America Co.

John M. Sheran, Blake Shepard, Jr., Daniel L. Palmquist, Leonard Street & Deinard, Minneapolis, MN, for Mall of America Associates.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon Motion for Summary Judgment brought by Defendants Mall of America Company and Simon MOA Management Company. For the following reasons, the Court grants Defendants' motion.

## BACKGROUND

In August 1992, the Mall of America ("the Mall") opened for business in Bloomington, Minnesota. The Mall, which is owned by Defendant Mall of America Company, a general partnership, and managed by Defendant Simon MOA Management Company, Inc., is the largest shopping center in the United States. It is home to numerous department and specialty stores, dining facilities, movie theaters, and other forms of entertainment, such as "Camp Snoopy" amusement park and "Underwater World."

Since its opening, taxicab service has been available to patrons at the Mall's Transit Station. The Mall's taxicab stand, which is located in a restricted parking area of the Transit Station known as the "Green Lot," is the second largest in the City of Bloomington. Historically, any Bloomington-licensed taxicab driver associated with a Bloomington-licensed taxicab company could solicit fares at the Mall's taxicab stand.

During the spring of 1996, the Mall experienced a considerable increase in taxicab traffic at the Transit Station. Until that time, the Mall had limited the number of taxis in the Transit Station to nine, which included three taxicabs at the stand and six taxicabs in the staging area. The increased number of taxis resulted in greater competition for available spots in the staging line and interference with the orderly flow of other traffic. In addition, arguments and conflicts arose between taxi drivers with greater frequency, requiring Mall security personnel to respond and intervene. On June 7, a contingent of drivers from various taxicab companies staged an informal strike, parking as many as forty taxicabs in the Green Lot in protest of the Mall's policy limiting the number of taxis on the premises. The strikers refused to pick up fares, disrupting both taxi service and traffic flow for Mall patrons.

In response to the strike, Thom Craner, Director of Operations for the Mall, arranged a meeting between Mall management and representatives of the taxicab companies. The meeting took place on June 12. There, company representatives and drivers aired complaints about limited access to the Transit Station and the inefficiencies of the staging system. Mall Manager, Virgil Heatwole, told those in attendance that if the companies could not police themselves and act professionally in providing service to Mall patrons, the Mall would contract with a limited number of taxicab companies to the exclusion of all others. The meeting ended with the companies agreeing that they would work together to resolve the disputes and problems that had been occurring.

The Mall took various steps to address the concerns expressed at the June meeting. Specifically, the staging line was reconfig-

ured to promote greater efficiency, and an additional space was created. Also, overflow parking was provided to accommodate more taxis after the Mall's retail stores had closed. Furthermore, Mall personnel were assigned to assist in traffic control on weekends.

Problems at the Transit Station, however, continued to arise, and even increased. From late June to late September, Mall security received 110 calls about disputes involving taxicab drivers from all of the companies licensed in Bloomington and serving the Mall. On occasion, security had to be dispatched to deal with such disturbances as often as five times in a single day. (*See* Sheran Aff., Ex. A ¶ 9.) The conflicts arose not only between drivers, but between drivers and Mall security personnel who responded to the calls. These incidents included violent and aggressive conduct, such as: two taxicabs colliding in an effort to get into a single open position in the staging line; a taxicab driver spitting on and striking another driver with his fist over a dispute about their position in the staging line; a driver threatening to go home, get a gun, and shoot another driver; and a driver threatening a security guard with the statement, "I'm going to kick your fucking ass and kill you," after the guard advised the driver of violating Mall policy. (*See id.*) The increased number of these types of incidents created a drain on the Mall's security and traffic-control resources.

During that same period of time, a number of incidents allegedly occurred involving exchanges between Mall security guards and taxicab drivers.[1] Specifically, Plaintiffs allege that certain Mall security guards engaged in racially hostile conduct towards minority drivers. On several occasions, guards used racial slurs and epithets when addressing individual minority drivers. (*See* Dian Aff. Ex. A) (summarizing incidents). In addition, guards denied minority drivers access to the Transit Station on various occasions when open spots existed in the staging line. (*See id.*) Moreover, guards refused to handle and resolve incidents involving white and minority drivers "in an objective or evenhanded fashion." (*See* Pls.' Mem. Opp'n at 5;

*see also* Dian Aff. Ex. A). In particular, guards would sometimes overlook infractions of the staging-area protocol by white drivers, but would enforce them against minority drivers. (*See* Dian Aff. Ex. A.) Furthermore, guards would reprimand minority drivers for driving too fast or too slow, but did not discipline white drivers in the same way. (*See id.*)

Several weeks after the June 12 meeting, with no apparent improvement in the situation, Virgil Heatwole directed Thom Craner and Greg Henricks, Mall Security Captain, to select two or three taxicab companies to provide exclusive taxi service to the Mall. Craner, in turn, delegated primary responsibility for selecting the companies to Henricks. As part of his investigation, Henricks contacted the Bloomington Taxi License Examiner and requested a list of all taxicab companies licensed in Bloomington. The list he received included the name of each company, the current number of licensed taxis operated by each company, and the date when each company was originally licensed by the City of Bloomington. Henricks contacted and met with representatives of Airport Taxi and Suburban Green & White Taxi ("Suburban Taxi"), the two largest companies. Henricks and Craner then decided to enter into exclusive service contracts with those two companies. The contracts took effect on September 7, 1996.

On September 24, 1996, Gold Star Taxi and Transportation Service Corp. ("Gold Star"), a minority-owned, Bloomington-licensed taxicab company, nineteen minority taxicab drivers, and one white taxicab driver employed by Gold Star filed the present lawsuit in federal court against Mall of America Company, Simon MOA Management Company, Inc., and ten John Does. The Complaint avers that Defendants violated provisions of various federal antidiscrimination statutes and the Minnesota Human Rights Act ("MHRA"). Specifically, in Count I of their Amended Complaint, Plaintiffs allege that Defendants' activities constitute race discrimination, in violation of 42 U.S.C. § 1981. Plaintiffs contend that the Mall security personnel intentionally discriminated against mi-

---

1. For the purposes of this motion, Defendants do not dispute Plaintiffs' factual allegations.

nority taxicab drivers and that the Mall's exclusive service agreement had the effect of excluding "virtually all" minority taxi drivers. Moreover, Counts II and III contain allegations that Defendants engaged in practices that denied them the full use and enjoyment of the Mall's Transit Station, a public accommodation, in violation of 42 U.S.C. § 2000a–2 and Minnesota Statutes section 363.03, subdivision 3(1), respectively. In Count IV, Plaintiffs assert that Defendants violated Minnesota Statutes section 363.03, subdivision 8a(c), which prohibits business discrimination, by excluding Plaintiffs from the Transit Station. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 2000a–6(a).

Subsequent to initiating this action, Plaintiffs filed a motion for a temporary restraining order and a motion for class certification. Both motions were denied by this Court. Defendant Mall of America Company and Defendant Simon MOA Management Company, Inc. (collectively, "Defendants") bring the present motion for summary judgment. The Court now turns to resolving the issues raised therein.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court determines materiality from the substantive law governing the claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. See id. A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party. See id. at 248–49, 106 S.Ct. at 2510. The Court reviews the present motion with these standards in mind.

## A. Discriminatory Interference With Contract

■ In Counts I and IV, Plaintiffs allege that Defendants' conduct interfered with their ability to contract for taxicab fares at the Mall in violation of federal and state anti-discrimination statutes. See 42 U.S.C. § 1981; Minn.Stat. § 363.03, subd. 8a(c). Section 1981 and MHRA section 363.03, subdivision 8a(c), prohibit racial discrimination in making and enforcing contractual relationships. In order to prevail on a claim under the statutes, a plaintiff must prove purposeful discrimination. See Patterson v. McLean Credit Union, 491 U.S. 164, 185–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). The framework for evaluating such claims is the same well-settled methods and order of proof applicable to Title VII causes of action. See id. at 186, 109 S.Ct. at 2377.

Specifically, the Court must determine whether the Price Waterhouse or McDonnell Douglas analysis properly applies to the evidence before it. See Price Waterhouse v. Hopkins, 490 U.S. 228, 278, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). If the evidence produced by Plaintiffs constitutes direct evidence, then the issue of deliberate discrimination must be resolved under a mixed-motive analysis. See id. at 276–78, 109 S.Ct. at 1804–05. Alternatively, if the proffered evidence merely supports an inference of discriminatory interference, then the issue must be resolved in accord with the familiar McDonnell Douglas burden-shifting analysis. See Patterson, 491 U.S. at 186, 109 S.Ct. at 2377 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); Danz v. Jones, 263 N.W.2d 395 (Minn.1978) (adopting McDonnell Douglas test for MHRA claims); see, e.g., Randle v. LaSalle Telecomm., Inc., 876 F.2d 563 (7th Cir.1989). Here, Plaintiffs base their discrimination claims on a neutral decisionmaker theory. (See Pls.' Mem. Opp'n at 19 n. 14.) Moreover, they contend that direct evidence exists such that these claims should be analyzed under the Price Waterhouse frame-

work. (*See id.* at 12 n. 6.) The Court addresses this contention first.

### 1. *The Price Waterhouse Analysis*

Under the *Price Waterhouse* analysis, when a plaintiff provides direct evidence that the decision at issue was based on an impermissible factor, the plaintiff satisfies their initial burden of proof. This analysis applies, however, only if the plaintiff produces "evidence that directly reflects the use of an illegitimate criterion in the alleged decision." *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n. 1, 202 (8th Cir. 1993) (the term "direct evidence" means that the plaintiff must present evidence showing a *specific link* between racial bias and the challenged decision) (emphasis added); *see also Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993) (defining "direct evidence" as "evidence which, if believed, proves the fact without inference or presumption."). In order to establish a prima facie case under *Price Waterhouse*, the evidence must show that race "played a motivating part" in the adverse decision. *Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. at 1790. Here, Plaintiffs' evidence does not establish such a finding.

█ Plaintiffs proffer the alleged racial slurs uttered by Mall security guards as the only "direct" evidence in support of their prima facie case,. In particular, Plaintiffs claim that on various occasions during the months of June to August 1996 security guards called minority drivers "monkey face" and "nigger." (Dian Aff., Ex. B.) Furthermore, Plaintiffs recount instances where minority drivers were taunted about "riding camels" and told to "go back to Africa." (*Id.*) Plaintiffs contend that these incidents sufficiently· support a finding of racial animus. The Court does not agree.

While the alleged slurs themselves were repugnant and inappropriate, the evidence indicates that they were infrequent and sporadic events. (*See* Dian Aff., Exs. A, B.) Plaintiffs' contention that these were regular incidents—testifying that they occurred "regularly" or "frequently"—is simply not supported by the record. Of the occurrences cited by Plaintiffs, only ten incidents of racial

slurs are attributed to identified guards. Those ten incidents are all attributed to three guards, with six of the ten attributed to a single guard. The Mall employs over one hundred security guards. The repugnant conduct of several individual guards, coupled with the infrequency of the events themselves, does not provide an adequate evidentiary basis for Plaintiffs' claims of discrimination. Therefore, the Court concludes that Plaintiffs have failed to create an issue of material fact that the alleged interference with cab fare contracts during the months of June, July, and August was motivated by the racial animus of Mall security guards.

Notwithstanding, Plaintiffs further contend that these same occurrences provide direct evidence that Henricks's and Craner's decision· to contract with Suburban Taxi and Airport Taxi was "tainted" by racial animus. Specifically, Plaintiffs argue that, in the process of selecting two taxicab companies, Henricks and Craner relied on security reports relating information about security calls involving taxicabs. These reports, claim Plaintiffs, likely were "artificially augmented" to make it appear that minority-owned taxicab companies and their drivers were causing a disproportionate number of problems at the Mall. Thus, according to Plaintiffs' charges, the Mall's exclusive-contract decision was infected by the guards' bias.

Again, the Court cannot agree. Plaintiffs are required to make a showing of "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804. When discriminatory comments are "vague and remote in time and administrative hierarchy, they are not more than 'stray remarks,' which are insufficient to establish discrimination." *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir.1991); *see also EEOC v. MCI Telecomm. Corp.*, 820 F.Supp. 300, 309 (S.D.Tex.1993). Under either the *Price Waterhouse* or *McDonnell Douglas* analysis, stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process are insufficient to establish a prima facie case. *See*

*Price Waterhouse,* 490 U.S. at 276–78, 109 S.Ct. at 1804–05.

The racial comments, which the Court assumes to have occurred for the purposes of this summary judgment motion, do not establish intentional discrimination with respect to the Mall's decision. First, Plaintiffs have failed to provide evidence of a nexus between the conduct of several guards and the ultimate decision by Henricks and Craner. There is no evidence that security incident reports were inaccurate or disproportionately skewed to the detriment of minority drivers. Moreover, on their face, the reports themselves contain no allusions or references to race. Second, Plaintiffs concede that there is no evidence that the decisionmakers themselves, Henricks and Craner, acted out of personal discriminatory animus when deciding to contract with the two companies selected. (*See* Pls.' Mem. Opp'n at 21.) Finally, as discussed above, the sporadic occurrence of the guards' racial comments fatally undermines Plaintiffs' prima facie case. Since the evidence of racial slurs and epithets is insufficient to establish racial animus on Plaintiffs' interference claims during the months of June to August, that evidence cannot establish that Henricks and Craner relied on "tainted" reports when making their decision. Speculation and theory are insufficient bases for establishing a prima facie case. Consequently, the Court concludes that the alleged racial remarks by security personnel fail to create a material issue of fact that would preclude summary judgment under the *Price Waterhouse* analysis.

### 2. The McDonnell Douglas Analysis

If a plaintiff fails to satisfy the *Price Waterhouse* threshold, the claims are evaluated under the framework articulated by the Supreme Court in the *McDonnell Douglas* and *Burdine* cases. *See Price Waterhouse,* 490 U.S. at 278–79, 109 S.Ct. at 1805–06. First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *See Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Second, if the plaintiff succeeds, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection.[2] *See id.* at 254, 101 S.Ct. at 1094. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered are a pretext. *See id.* at 256, 101 S.Ct. at 1095. The plaintiff's ultimate burden of proving intentional discrimination emerges under step three. *See id.* In this case, summary judgment is required since Plaintiffs fail to establish a prima facie case of discrimination.

#### a. Prima Facie Case

The initial burden falls on Plaintiffs' shoulders. The Supreme Court explicitly noted that the requirements of the prima facie test may vary depending on the circumstances involved. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. While this burden is not onerous, *see id.* at 253, 101 S.Ct. at 1093, Plaintiffs must show the following: (1) that they are members of a minority group, (2) that they were qualified for the work, (3) that they were denied the opportunity to contract for the work, and (4) that after the denial Defendants allowed nonmembers of the protected class to do the same work. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991). If Plaintiffs are unable to establish at least the minimal elements of the prima facie case under the *McDonnell Douglas* analysis, then summary judgment is required. *See Randle v. LaSalle Telecomm., Inc.,* 876 F.2d 563, 568 (7th Cir.1989) (citing *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at

---

**2.** Plaintiffs argue that their MHRA claim for business discrimination, Minn.Stat. § 363.03, subd. 8a(c), requires a separate analysis from the classical burden-shifting framework under *McDonnell Douglas.* Specifically, Plaintiffs note that the statute prohibits specific types of business discrimination, "unless the alleged refusal or discrimination is because of a legitimate business purpose." § 363.03, subd. 8a(c). Thus, unlike the *McDonnell Douglas* analysis, the statute places the burden of proof on a defendant to establish evidence in support of an affirmative defense based on a legitimate business reason. The Court, however, need not address this issue since it finds that Plaintiffs fail to make out a prima facie case of discrimination.

2552). In this case, Plaintiffs have failed to satisfy these elements.

As a minority-owned taxicab company and minority and foreign-born individuals, Plaintiffs are members of a protected class. Moreover, Plaintiffs Gold Star Taxi and the named taxicab drivers are qualified to work. They are duly licensed to operate taxicabs in the City of Bloomington and have provided service to Mall patrons at the Transit Station. However, while Plaintiffs satisfy these first two elements, the proffered evidence fails with respect to the remaining elements.

As for the third element, Plaintiffs claim that the Mall prevented them from contracting in two ways: (1) Mall security guards engaged in racially discriminatory conduct from June through August 1996, interfering with and limiting Plaintiffs' opportunities to contract with Mall patrons, (see Am. Compl. ¶¶ 34–36); and (2) the Mall entered exclusive service contracts that permanently excluded Plaintiffs from contracting with patrons at the Mall after September 7, 1996, (see id. ¶¶ 37–40, 58–60). Additionally, as to the fourth element, Plaintiffs allege that Airport Taxi and Suburban Taxi, nonminority-owned companies with a substantial number of nonminority drivers, were free to contract for fares after the exclusive contracts became effective on September 7.

■ To support their prima facie case, Plaintiffs offer various bits of evidence. In addition to the above-discussed racial slurs, Plaintiffs claim that guards treated minority drivers differently by affirmatively treating white drivers more favorably. In particular, Plaintiffs allege that on occasion guards disciplined minority drivers for "fabricated or trivial offenses." (Pls.' Mem. Opp'n at 14). For example, guards allegedly disciplined some minority drivers for circling the Mall too many times, for driving too fast or too slow, and for leaving taxicabs unattended. (See Dian Aff., Ex. B .) Also, guards occasionally refused minority drivers access to the Transit Station when open spaces were available. (See id.) In addition, guards ignored minority drivers' complaints about white drivers' conduct and rules infractions. (See id.)[3]

Assuming all these allegations to be true, the evidence fails to satisfy Plaintiffs' initial burden. As with the racial slurs, the allegations of disparate treatment in rules enforcement and discipline during the months of June through August are simply insufficient to make out a prima facie case of discrimination. The incidents described occurred during a short, three-month period and are infrequent and sporadic.

Plaintiffs also ignore the undisputed evidence that the persons responsible for directing taxicab admission into the staging area could not see the drivers and, thus, could not deny them admission on the basis of their race. The staging area was regulated by two Mall employees who were stationed at the entryway to the Green Lot. From this location, the employees could not observe oncoming traffic, the status of the staging line, or the activity at the cab stand. A driver was admitted to the Transit Station only when other employees posted at the cab stand informed the Green Lot employees via two-way radio that a taxicab exited the staging area.

Most significantly, the evidence does not show that the activity hindered Plaintiffs' solicitation of fares. While on occasion a particular individual was banned from the Transit Station for a period of time for a rule infraction, drivers who were ticketed or reprimanded for violations were allowed to pick up fares nonetheless. As such, the alleged actions by the guards—racial slurs, tauntings, issuance of warnings, and reprimands for rule violations—did not impede Plaintiffs' ability to contract. Consequently, the Court concludes that Plaintiffs have not made out a prima facie case of discrimination as to actions occurring during June through August.

---

3. Plaintiffs also claim that guards taunted them as they prayed. (See, e.g., Dian Aff., Ex. B at B–16, B–23, & B–37.) Discrimination claims based on religious practices, however, are not cognizable under section 1981 or section 363.03. See Minn.Stat. § 363.03, subd. 8a(c) (proscribing discrimination "because of a person's race, color, sex, sexual orientation, or disability...."); Anooya v. Hilton Hotels Corp., 733 F.2d 48, 50 (7th Cir.1984) ("Thus, section 1981 does not protect against discrimination based on ... religion....").

■ Furthermore, Plaintiffs have not established a prima facie case with respect to Defendants' conduct in entering the exclusive service contracts. While it is clear that Plaintiffs were denied the opportunity to solicit taxicab fares after September 7, Plaintiffs have failed to show that the exclusive contracts resulted in nonminority drivers having access to the Transit Station to the exclusion of minority drivers. In fact, the statistical evidence provided by Plaintiffs reveals that the contracts affected taxicab companies and drivers, regardless of race, in a similar way.

Specifically, Plaintiffs offer statistical evidence of disparate impact in establishing both their prima facie case and pretext. On September 7, 1996, there were 549 taxi drivers licensed in Bloomington, 538 of known racial status. Of the 538 drivers, 330 (61 .3%) were white and 208 (38.7%) were nonwhite. When the Mall entered into its exclusive service contracts with Airport Taxi and Suburban Taxi, the two companies had 281 licensed drivers available to service Mall patrons. Of the 281 drivers, 244 (86.8%) were white and 37 (13.2%) were nonwhite. Plaintiffs assert that a race-neutral decision would result in 38.7% of nonwhite drivers retaining access to the Mall.

Plaintiffs' argument, however, ignores several salient points that obviate the significance of these numbers as evidence of disparate impact. While statistical evidence is proper in these circumstances, statistics "without an analytic foundation ... are virtually meaningless." *Brown*, 939 F.2d at 952. Plaintiffs avoid discussing the obvious race-neutral impact of the Mall's decision on the Bloomington taxicab companies. "It is difficult to hold that a practice which affects applicants of all races in the same manner is actually designed to conceal a racially discriminatory motive." *Id.* at 951 (citing *Giles v. Ireland*, 742 F.2d 1366, 1375–76 (11th Cir. 1984), and *Cannon v. Teamsters & Chauffeurs Union*, 657 F.2d 173, 176–77 (7th Cir. 1981)). Here, at the time the exclusive contracts became effective, there were thirteen taxicab companies licensed in Bloomington.

Of the thirteen, five were minority-owned and eight were white-owned companies. When the Mall contracted with two white-owned companies, it also excluded six other white-owned companies along with five minority-owned companies. The contracts affected the six white and five minority-owned taxicab companies in the same manner.

In addition, the undisputed evidence shows that the minority composition of Airport Taxi and Suburban Taxi has increased since September 7 due to hiring by the companies. Some of the hired drivers are minority persons excluded from serving the Mall because of the exclusive contracts.[4] Despite this increase in minority composition, as well as the hiring of some minority drivers excluded from the Mall by the exclusive contracts, the Mall has honored its contracts. Consequently, the Court concludes that Plaintiffs have failed to demonstrate by a preponderance of the evidence a prima facie case of discrimination and that summary judgment should be granted as to Counts I and IV.

*b. Legitimate, Nondiscriminatory Reasons*

However, even if Plaintiffs could establish a prima facie case of discrimination, Defendants easily satisfy their burden. At the second stage of the *McDonnell Douglas* analysis, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for contracting with Airport Taxi and Suburban Taxi. *See Patterson*, 491 U.S. at 187, 109 S.Ct. at 2378. The Mall offers several credible nondiscriminatory reasons for both its enforcement of traffic rules against individual taxicab drivers and its decision to contract with two taxicab companies.

■ As a prefatory note, it is undisputed that the Mall faced a situation requiring it to take action that would give the Mall more control over the Transit Station area. The mounting turmoil between drivers was becoming troublesome for Mall personnel and patrons. In light of these problems, Plaintiffs do not question the necessity of assuring order and safety with respect to the taxi service provided to Mall patrons. Addition-

---

4. Since September 7, 1996, Airport Taxi has hired 31 drivers. Thirteen of these new hires are minority persons, and 10 of those are foreign-born individuals who were previously associated with one of the 5 minority-owned taxicab companies.

ally, Plaintiffs do not challenge the legitimacy of Defendants' business decision to enter into exclusive contracts, its right to contract with the two companies, or its right to control the services that are provided on the Mall's property. Instead, Plaintiffs sole point of contention is that the decision, which excluded them, was based on a purposeful intent to discriminate against them · based on their race.

In response, Defendants contend that the traffic rules are based on legitimate safety concerns and a need to maintain order. For example, Plaintiffs characterize the Mall's rule regulating traffic speed as arbitrary. The rule, however, helped to regulate traffic when taxicabs repeatedly circled the Green Lot waiting for an opening in the staging line. Drivers would slow down when approaching the staging area in the hope that a position would open before they passed, and then speed up as they circled back around to reapproach the staging area again. This behavior resulted in traffic delays and general chaos around the Transit Station. Drivers were reprimanded for failing to maintain a consistent, reasonable speed as they circled the Green Lot.

The Mall also began to more strictly enforce its policy that drivers in the Green Lot could not leave their taxicabs unattended. As taxicab traffic ·increased in 1996, the Mall received complaints that drivers were parking in the Green Lot and then lingering thereby making telephone calls or using the· restroom facilities. By lingering, drivers hoped to increase their chance of obtaining an opening in the staging area without leaving the Mall property, as required by Mall policy. The Mall began issuing warnings and disciplining drivers for engaging in this practice.

In addition, the Mall claims that security guards were not responsible for and were not supposed to listen to, investigate; or resolve any controversies among the taxicab drivers. Thus, Plaintiffs allegations that Mall security personnel ignored drivers disputes is without merit as it was not their job. Security guards were employed at the Mall for the purpose of de-escalating hostile situations. They advised disputing parties to resolve the issue among themselves, and if they were

unable to do so, they were asked to leave. If an incident escalated or involved criminal conduct, Mall security guards would contact the Bloomington Police Department

 The Mall further offers legitimate nondiscriminatory reasons of its decision to contract with two companies. "To rebut plaintiffs prima facie case, the defendant need not demonstrate that the individual or company selected was actually more qualified than the plaintiff, rather it must only show that it had a legitimate nondiscriminatory reason for its action." *Brown,* 939 F.2d at 953. Henricks's and Craner's selection hinged predominantly on the large size of Airport Taxi's and Suburban Taxi's fleets. According to Henricks, "The main criterion we used in our selection process was the number of licensed cabs these companies had. The size of the companies was important to our maintaining control over and accountability of the companies selected, while still providing a sufficient number of cabs to serve the Mall's patrons." (Grell Aff., Ex. G ¶ 20.) The size of both companies ensured that the Mall would have a sufficient number of taxicabs to service Mall patrons even at peak times.

Defendants further note that the apparent superior quality of the two companies' fleets was another consideration. Vehicle quality meant reliability and better service to Mall patrons. Moreover, the two companies also had modern, electronic dispatch systems that ensured greater responsiveness to service needs and accountability to the Mall.

The Court finds that Defendants have produced credible nondiscriminatory reasons for its actions with respect to its treatment of ·individual drivers and its decision to enter exclusive contracts. The enforcement of traffic rules was necessary for maintaining safety and order on Mall property, particularly around the Transit Station. Also, the decision to contract with Airport Taxi and Suburban Taxi was based on the Mall's judgment that these companies were larger, had better fleets, and had demonstrated greater ability to reliably control and dispatch their drivers. Thus, Defendants have satisfied their burden at this stage of the analysis and are entitled to summary judgment unless

Plaintiffs present evidence that Defendants' reasons were pretextual.

### c. Pretext

Plaintiffs, however, fail to provide adequate evidence of pretext. At this stage, a plaintiff must answer the defendant's nondiscriminatory rationales with evidence showing that the proffered reasons are merely pretexts for race discrimination. Specifically, Plaintiffs must set forth evidence sufficient to permit a reasonable inference that Defendants intentionally discriminated against them. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517–18, 113 S.Ct. 2742, 2752–53, 125 L.Ed.2d 407 (1993); *see also Brown*, 939 F.2d at 950 ("If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with *specific evidence* demonstrating that the reasons given by defendant were a pretext for discrimination.") (emphasis added). Here, however, Plaintiffs respond with nothing more than conjecture and speculation, coupled with a rehash of circumstantial evidence offered in support of its failed prima facie case. Such a response does not establish a reasonable inference of pretext.

■ To challenge the Mall's decision to contract with the two largest taxicab companies, Plaintiffs claim that, despite the large number of taxicabs, Defendants did not "know whether that company's cab drivers would in fact work" the Mall. (Pls.' Mem. Opp'n at 26.) In addition, Plaintiffs claim that Craner did not really have solid reasons for the decision he made with Henricks. To show pretext, however, a plaintiff "cannot simply show that the [decisionmaker's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [decisionmaker], not whether the [decisionmaker] is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). The fact that Defendants' decision may have been uninformed is not evidence that it was motivated by racial animus.

■ Plaintiffs also offer again the allegations of racial slurs and epithets uttered by Mall security guards. At this stage, as discussed above, there is an "insufficient causal link between these comments and the actions taken by defendant to show discrimination directly." *Monaco v. Fuddruckers, Inc.*, 789 F.Supp. 944, 952 (N.D.Ill.1992). The sporadic nature of the remarks is inadequate to show that the Mall's rules were enforced for a discriminatory purpose or in a discriminatory manner. Moreover, they fail to show that a minority-owned taxicab company would have received a contract but for the nationality of its owner or drivers.

In addition, Plaintiffs reassert evidence that guards allegedly enforced rules and disciplined minority drivers but not white drivers. At best, the evidence shows only that rules-enforcement and discipline was arbitrary. Arbitrariness, however, is not prohibited under the law at issue here. Plaintiffs must offer direct or indirect evidence of an intent to discriminate. *See Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir.1996).

■ Plaintiffs further reassert the statistical evidence offered to establish their prima facie case. As discussed there, the evidence undermines Plaintiffs' claims of discrimination. A decision cannot be pretextual when it affects applicants of all races in the same manner. *See Brown*, 939 F.2d at 952. The Mall's decision to contract with two white-owned companies resulted in the exclusion of six other white-owned companies in addition to five minority-owned companies. Thus, the decision clearly had a race-neutral impact.

■ Plaintiffs also offer as evidence six lawsuits and five administrative charges of discrimination brought against the Mall involving claims of racial bias arising from the conduct of security guards. (*See* Dian Aff., Ex. D.) Plaintiffs claim that this evidence tends to prove intent to discriminate. (*See* Pls.' Mem. Opp'n at 17.) These various actions, however, do not prove intent. First, the number of charges are minimal in relative terms. With hundreds of employees spanning a period of over four years, eleven filings are insufficient to establish awareness of or intent to discriminate. Second, Plaintiffs do not allege that these charges bore any relationship to the actions complained of

by Plaintiffs. Finally, none of the filings ever resulted in a finding of discrimination against the Mall. Therefore, this evidence is inadequate to raise a material fact dispute regarding pretext.

Congress's goal in enacting section 1981 was to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976). Plaintiffs have not met their burden of demonstrating that because of their race they were impeded from contracting with Mall patrons during the months of June through August. Moreover, Plaintiffs have failed to show that but for their race, they would have enjoyed continued, unfettered access to the Mall Transit Station. *See Brown*, 939 F.2d at 953 ("Plaintiff could not prevail unless he could show that but for his race, he would have received this Honda franchise.").

There is no genuine issue of material fact, employing the *Price Waterhouse* analysis, as to whether Plaintiffs were discriminated against in violation of section 1981 or section 363.03, subdivision 8a(c). Also, Plaintiffs fail to raise a genuine issue sufficient to establish a prima facie case or make a showing of pretext under the *McDonnell Douglas* test. This test is merely a "means for sifting through the circumstantial evidence presented to determine if the defendant treated the plaintiff differently because of his race." *Id.* Although Plaintiffs have produced scattered pieces of circumstantial evidence, none of it, taken as a whole, demonstrates that the Mall intentionally discriminated against Plaintiffs as alleged. Consequently, the Court determines that Defendants' motion for summary judgment should be granted, and dismisses Count I and Count IV.

### B. Public Accommodation

In Counts II and III of their Complaint, Plaintiffs claim that the exclusive service contracts denied them the full use and enjoyment of a public accommodation in violation of 42 U.S.C. § 2000a–2 ("Title II" or "the Act") and MHRA section 363.03, subdivision 3(1). Specifically, Plaintiffs allege that the agreements with Airport Taxi and Suburban Taxi "completely denied plaintiffs the full and equal enjoyment of ... the [Mall] Transit Station because of their race, color, and ethnicity." (*See* Am. Compl. ¶¶ 47 & 53.) The Court does not agree.

Defendants concede that the Transit Station is a public accommodation for persons seeking to use the taxicab services provided there. It is clear that the statutes proscribe the Mall from denying its patrons access to the Transit Station on the basis of an enumerated characteristic. The overriding purpose for Congress's enactment of Title II was to remove the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969). This purpose is borne out by the language of the Act:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a(a).[5]

Plaintiffs, however, seek to apply the statutory prohibitions to permit them to "provide" services at, not merely enjoy the benefits of access to, a public accommodation. The Court is reluctant to recognize such an application of the law. For Plaintiffs' purposes, the Transit Station is not a public accommodation. To determine whether a group is public or private, two criteria are used: (1) the selectiveness of the group in the admission of members; and (2) the existence of limits on the size of the membership. *See United States Jaycees v. McClure*, 305 N.W.2d 764, 770 (Minn.1981). In this case, the Mall never permitted unfettered public access to provide taxicab service at the Tran-

---

5. The language of the federal statute is mirrored by the MHRA, which provides in part: "It is an unfair discriminatory practice to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color...." § 363.03, subd. 3(a)(1).

sit Station. The right to provide such services in Bloomington is limited by municipal regulations. A person must meet various qualifications in order to be eligible, and it is illegal to solicit fares without a license. Moreover, at the time this action was initiated, there were a limited number of qualifying persons and companies able to legally provide service to the Mall. For all these reasons, the Mall Transit Station is not a place of public accommodation for providers of taxicab service.

Even if the Court were to adhere to Plaintiffs' statutory interpretation, the claims would still be dismissed as a matter of law. Plaintiffs have failed to establish that the decision denying them access to the Transit Station was on the basis of their race. As such, the exclusion cannot be unlawful. Therefore, the Court determines that Defendants' motion for summary judgment should be granted and that Counts II and III should be dismissed.

### C. Other Matters

Lastly, having determined that the instant action should be dismissed as to all the other named Defendants, this Court also dismisses the action as to the ten, unidentified Defendants, "John Does." Even after the completion of discovery, Plaintiffs have not ascertained the identity of or established any facts regarding these unnamed Defendants. Accordingly, on its own initiative, the Court dismisses the claims against the ten John Doe Defendants.

### CONCLUSION

Plaintiffs have failed to provide a sufficient factual basis for making out a prima facie case of intentional discrimination. Instead, apart from the sporadic incidents of racial slurs uttered by Mall security guards, Plaintiffs have relied on mere allegations, conclusory statements, and assertions of belief rather than fact. Such material cannot raise a genuine dispute on a question of material fact to preclude summary judgment. Furthermore, Plaintiffs' claims for discrimination in public accommodation are infirm. The Mall Transit Station is not a public accommodation for the purposes sought by Plaintiffs and, more significantly, Plaintiffs have failed

to demonstrate that their exclusion was based upon race. Finally, the Court dismisses Plaintiffs' action against the unidentified John Doe Defendants. After ample time for discovery, Plaintiffs have not identified these individuals or established any facts regarding them.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Clerk Doc. Nos. 62 & 69) is GRANTED; and

2. The Amended Complaint (Clerk Doc. No. 31) is DISMISSED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**